[No. S037642. Mar. 6, 1995.]

RICHARD M. DeVITA et al., Plaintiffs and Appellants, v.
COUNTY OF NAPA et al., Defendants and Respondents.

**COUNSEL**

Gagen, McCoy, McMahon & Armstrong, Mark L. Armstrong, Patricia E. Curtin and Charles A. Klinge for Plaintiffs and Appellants.

Michael H. Krausnick, County Counsel (Stanislaus), E. Vernon Seeley, Assistant County Counsel, Victor J. Westman, County Counsel (Contra Costa), Ronald A. Zumbrun, James S. Burling, Edward J. Connor, Jr., Nossaman, Gunther, Knox & Elliott, Alvin S. Kaufer, Winfield D. Wilson, Morrison & Foerster, David A. Gold, Arturo J. Gonzalez, R. Clark Morrison, J. Michael Stusiak, Gregory B. Caligari, Latham & Watkins, Robert K. Break, Allen D. Haynie and David A. Twibell as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert Westmeyer, County Counsel, Margaret Woodbury, Chief Deputy County Counsel, Shute, Mihaly & Weinberger, Mark I. Weinberger, Rachel B. Hooper and Christy H. Taylor for Defendants and Respondents.

Susan L. Goodkin, Roy Gorman, Daniel P. Selmi, Myers, Widders & Gibson and Katherine E. Stone as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**MOSK, J.**—In November of 1990, the voters of Napa County enacted Measure J, an initiative that amends the land-use element of the county's general plan to preserve agricultural land. Measure J made the redesignation of existing agricultural land and open space essentially conditional on voter approval, with certain exceptions, until the year 2021. The questions before the court are whether a county's general plan can be amended by an initiative of the county's electorate acting pursuant to article II, section 11 of the California Constitution, and whether the electorate can properly impose the 30-year voter approval requirements provided in Measure J. We conclude that the statutory provisions governing local planning, Government

Code sections 65100-65763 (planning law), do not prohibit the exercise of the initiative power to amend the land use element of a general plan. Moreover, Elections Code section 9111[1] specifically allows for such amendment. We further find no statutory or constitutional defect in Measure J's voter approval provisions. Accordingly, we affirm the judgment of the Court of Appeal upholding Measure J.

## I. FACTS

The material facts are not in dispute. County voters approved Measure J at the November 6, 1990, election. By its terms, the initiative confirms and readopts, until the year 2021, existing portions of the land use element of the general plan that designate land as either "Agricultural, Watershed and Open Space" or "Agricultural Resource" land (agricultural land). Moreover, Measure J readopts certain general plan policies regarding minimum parcel size and maximum building densities. Measure J also adds a new subsection 9 to the "Land Use Element," providing that until December 31, 2020, the provisions of the general plan and map readopted by Measure J can be amended only on a vote of the people, except that the land can be redesignated: (1) in conjunction with its annexation to a city; (2) after the board of supervisors makes certain specified findings, including that the land is physically unusable for agriculture, that it is unlikely to be annexed in the future, and that the proposed use of the land is compatible with agriculture; (3) to accommodate the siting of a solid waste disposal facility; or (4) to avoid an unconstitutional taking of property.

On March 6, 1991, Richard M. DeVita and four other Napa County residents, as well as the Building Industry Association of Northern California, a nonprofit association, and Security Owners Corporation, Inc., a California corporation (hereafter collectively plaintiffs), filed a complaint and petition for writ of mandate against Napa County and its board of supervisors (County)[2] seeking a declaratory judgment that Measure J is invalid and a writ of mandate ordering the board of supervisors to cease enforcing the measure. The original complaint alleged, inter alia, that Measure J rendered the general plan internally inconsistent and that it violated state housing laws. When the case was tried in Napa County Superior Court, however,

---

[1]On January 1, 1995, after this case had been briefed and argued, the repeal and reenactment of the Elections Code went into effect. Although none of the Elections Code provisions pertinent to this case underwent any substantive modification, they were reorganized and renumbered. For the sake of currency and consistency, all Elections Code references will be to the newly enacted code.

[2]A number of amicus curiae briefs were filed on behalf of both plaintiffs and the County. For the sake of convenience, amici curiae's arguments will be attributed to the parties in this case.

plaintiffs had abandoned all but two claims: (1) that general plans could not be amended by initiative and (2) that the authority of future boards of supervisors to amend the general plan cannot be limited by mandatory voter approval requirements such as those found in Measure J. A hearing took place on June 12, 1992, with evidence received by way of stipulated facts and agreed-upon exhibits.

In its written decision, the trial court noted that there was "no evidentiary showing that the amendment either facially will result or as applied has resulted in any internal inconsistency between . . . the amended Land Use Element . . . and the other elements of the General Plan including the housing or circulation elements." The trial court then concluded that Measure J was a valid exercise of the initiative power, and denied plaintiffs all relief.

The Court of Appeal affirmed. It found that Elections Code section 9111 explicitly contemplated the amendment of general plans by initiative. The Court of Appeal also rejected various arguments by plaintiffs that the planning law had exclusively delegated the authority to amend the general plan to the board of supervisors. We granted review to resolve the important question of whether a general plan can be amended by initiative.

## II. The Validity of General Plan Amendment Initiatives

### A. *Statutory Framework and Case Law Background*

We begin our discussion with a brief review of the planning law and its relation to the right of initiative. Although California law has prescribed that cities and counties adopt general or master plans since 1927 (Stats. 1927, ch. 874, pp. 1899-1913), the general plan prior to 1972 has been characterized as merely an "interesting study," and no law required local land use decisions to follow the general plan's dictates. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 [160 Cal.Rptr. 907].) In 1971 several legislative changes were made to significantly alter the status of the general plan. For the first time, proposed subdivisions and their improvements were required to be consistent with the general plan (Gov. Code, § 66473.5 [formerly in Bus. & Prof. Code, § 11526]), as were zoning ordinances (Gov. Code, § 65860). (Stats. 1971, ch. 1446, §§ 2, 12, pp. 2853, 2858; *City of Santa Ana, supra*, 100 Cal.App.3d at p. 532.) Moreover, charter cities were no longer completely exempted from the requirements of the planning law; these cities had to at least adopt general plans with the required mandatory elements. (Gov. Code, § 65700, subd. (a); Stats. 1971, ch. 1803, § 2, p. 3904.) Thus after 1971 the general plan truly became, and

today remains, a " 'constitution' for future development" (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317] (*Lesher Communications*)) located at the top of "the hierarchy of local government law regulating land use" (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [203 Cal.Rptr. 401]).[3]

The general plan consists of a "statement of development policies . . . setting forth objectives, principles, standards, and plan proposals." (Gov. Code, § 65302.) The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require (*id.*, § 65301). General plans are also required to be "comprehensive [and] long[]term" (*id.*, § 65300) as well as "internally consistent." (*Id.*, § 65300.5.) The planning law thus compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions.

Once a general plan is adopted, it may be amended by the legislative body (Gov. Code, § 65358, subd. (a))[4] after undergoing a series of procedural steps (*id.*, §§ 65351-65356). Government Code section 65351 provides that "[d]uring the preparation or amendment of the general plan, the planning agency shall provide opportunities for the involvement of citizens, public agencies, public utility companies, and civic, education, and other community groups, through public hearings and any other means the city or county deems appropriate." Government Code section 65352 provides that, before the adoption or amendment of a general plan, the legislative body "shall" refer the proposed action to various public entities, although it also states that "[t]his section is directory, not mandatory . . . ." Government Code sections 65353 and 65354 provide that the planning commission must hold "at least one" public hearing on any general plan amendment and makes its written recommendation to the legislative body. Government Code sections 65355 and 65356 then provide that the legislative body must hold at least one public hearing and by resolution either approve, modify, or disapprove

[3]The dissent eruditely recounts the pre-1971 history of the planning law, and in particular the planning law's antecedents in the Standard Planning Act. A comparison between Standard Planning Act and the current planning law makes clear, however, that the Legislature has decisively *rejected* the Standard Planning Act's model of planning as something distinct from the local legislative function, to be performed by an apolitical planning commission. Instead, the current planning law recognizes unequivocally that planning is a legislative undertaking (see Gov. Code, § 65301.5), and therefore, as explained below, presumptively the proper subject of popular initiative.

[4]Government Code section 65358, subdivision (a), states in pertinent part that "[i]f it deems it to be in the public interest, the legislative body may amend all or part of an adopted general plan. An amendment to the general plan shall be initiated in the manner specified by the legislative body."

the recommendation. A role is also given in the general plan adoption and amendment process to the local planning agency, which is assigned the task to prepare, periodically review, and revise the general plan. (*Id.*, § 65103, subd. (a).)

The amenability of land-use and planning measures, such as the general plan, to the power of initiative and referendum is not a novel issue in this state. We have held that zoning ordinances are subject to amendment by initiative (*Arnel Development* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 516 [169 Cal.Rptr. 904, 620 P.2d 565]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473] (*Associated Home Builders*)) and that general plan amendments are subject to referendum (*Yost* v. *Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152] [hereafter sometimes *Yost*]). Although we have never considered whether a local initiative could amend the general plan, a number of Court of Appeal decisions have either held that such initiative amendments were valid, or assumed as much. (See, e.g., *Save Stanislaus Area Farm Economy* v. *Board of Supervisors* (1993) 13 Cal.App.4th 141, 152 [16 Cal.Rptr.2d 408] [holding that general plans may be amended by initiative]; *Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 290-302 [3 Cal.Rptr.2d 504] [upholding a general plan amended by initiative]; *Northwood Homes, Inc.* v. *Town of Moraga* (1989) 216 Cal.App.3d 1197 [265 Cal.Rptr. 363] [upholding an initiative amendment]; *Lee* v. *Monterey Park* (1985) 173 Cal.App.3d 798, 811-813 [219 Cal.Rptr. 309] [upholding an initiative requiring voter approval for all amendments to land use element of general plan]; *Duran* v. *Cassidy* (1972) 28 Cal.App.3d 574, 583-586 [104 Cal.Rptr. 793] [holding that general plan of charter city subject to amendment by initiative]; *Fletcher* v. *Porter* (1962) 203 Cal.App.2d 313, 318-320 [21 Cal.Rptr. 452] [upholding initiative amendment to charter city's "master plan"].)

Those courts that have examined the planning law have concluded that "[t]he adoption and amendment of a general plan is a local legislative matter and not of statewide concern," and therefore the proper subject of initiative. (*Duran* v. *Cassidy*, *supra*, 28 Cal.App.3d at p. 583; *Fletcher* v. *Porter*, *supra*, 203 Cal.App.2d at pp. 318-319.) This generally accepted principle was set forth in an opinion of the Attorney General in 1983: "A . . . general plan may be amended by the initiative process, but such amendment must comply with the substantive requirements for a general plan." (66 Ops.Cal.Atty.Gen. 258, 259 (1983).)

The correctness of the Attorney General's view seemed confirmed by our own opinion the following year in *Yost*, *supra*, 36 Cal.3d 561, upholding the

use of a referendum to overturn a general plan amendment implementing a local coastal plan under the Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, § 3000 et seq.). We held that general plan amendments were legislative acts subject to referendum. (36 Cal.3d at p. 570.) We further found that the Coastal Act, although setting "minimum standards and policies" for localities to follow in developing land use plans, left "wide discretion to a local government . . . to determine the contents" of such plans, and therefore did not preclude general plan amendments implementing a local coastal plan from being subject to referendum. (*Id.* at pp. 572-573.)

We endorsed the position that general plans can be amended by initiative in *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 504 [247 Cal.Rptr. 362, 754 P.2d 708] (*COST*). We cited in dicta the above mentioned Attorney General's opinion and referred to the planning law as an example of legislation that "dealt with purely local concerns" and was therefore capable of being enacted by initiative. Two years later, however, in *Lesher Communications, supra,* 52 Cal.3d at pages 539-540, footnotes 7-8, while not deciding the matter, we noted several arguments against general plan amendment initiatives, implicitly inviting reconsideration of the issue.

As set forth below, we now find that the Courts of Appeal and the Attorney General have correctly concluded that general plans can be amended by initiative.

### B. *Scope of an Initiative and the General Plan*

 Any discussion of whether a general plan amendment can be enacted by initiative must begin with the recognition that the local electorate's right to initiative and referendum is guaranteed by the California Constitution, article II, section 11,[5] and is generally co-extensive with the legislative power of the local governing body. (See *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 129 [222 P.2d 225].) As we recently stated in *Voters for Responsible Retirement* v. *Board of Supervisors* (1994) 8 Cal.4th 765, 777 [35 Cal.Rptr.2d 814, 884 P.2d 645] (*VFRR*): "[W]e will presume, absent a clear showing of the Legislature's intent to the contrary, that legislative decisions of a city council or board of supervisors . . . are subject to initiative and referendum." This presumption rests on the fact that the 1911 amendment to the California Constitution conferring the right of initiative and referendum was "[d]rafted in light of the theory that all power of government ultimately resides in the people" and that "the amendment

---

[5]California Constitution, article II, section 11 provides: "Initiative and referendum powers may be exercised by the electors of each city and county under procedures that the Legislature shall provide. This section does not affect a city having a charter."

speaks of initiative and referendum, not as a right granted the people, but as a power reserved by them." (*Associated Home Builders, supra,* 18 Cal.3d 582, 591, fn. omitted.) It is " 'the duty of the courts to jealously guard this right of the people' [citation] . . . . '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right [to local initiative or referendum] be not improperly annulled.' " (*Ibid.*)

■ The presumption in favor of the right of initiative is rebuttable upon a definite indication that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right. (See *VFRR, supra,* 8 Cal.4th at p. 779; *COST, supra,* 45 Cal.3d at pp. 511-512.) Accordingly, we have concluded that the initiative and referendum power could not be used in areas in which the local legislative body's discretion was largely preempted by statutory mandate. (See *Simpson* v. *Hite, supra,* 36 Cal.2d 125, 133-134 [initiative or referendum power cannot be used to interfere with board of supervisor's duty to provide suitable accommodations for courts]; *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 557-558 [219 P.2d 457] [local governing body's contract with local housing authority is an administrative act under state and federal public housing law and therefore not subject to referendum].) These and other cases led to the formulation of a general dichotomy between a governing body's legislative acts, which are subject to initiative and referendum, and its administrative or executive acts, which are not. (See *Yost, supra,* 36 Cal.3d 561, 569-570.)

In *COST, supra,* 45 Cal.3d 491, we recognized that not all restrictions of the local initiative or referendum power arise from instances in which the governing body's legislative discretion is circumscribed. In some cases, the Legislature did not intend to restrict local legislative authority but rather to delegate the exercise of that authority exclusively to the governing body, thereby precluding initiative and referendum. (*COST, supra,* 45 Cal.3d at p. 511.) *COST* also set forth certain guidelines for determining when the legislative intent to exclusively delegate authority to the local governing bodies is present. The paramount factors recognized by *COST* are: (1) statutory language, with reference to "legislative body" or "governing body" deserving of a weak inference that the Legislature intended to restrict the initiative and referendum power, and reference to "city council" and/or "board of supervisors" deserving of a stronger one (*id.* at p. 501); (2) the question whether the subject at issue was a matter of "statewide concern" or a "municipal affair," with the former indicating a greater probability of intent to bar initiative and referendum (*id.* at pp. 505-507). Any other indications of legislative intent were, of course, also to be considered. (*Id.* at pp. 505.)

*COST* did not represent a sea change in our referendum and initiative jurisprudence, but rather brought to light certain interpretive principles implicit in case law. We did not intend to prescribe a set of fixed rules for mechanically construing legislative intent. Nor did *COST* alter the constitutionally based presumption that the local electorate could legislate by initiative on any subject on which the local governing body could also legislate. Thus it is still the case that " ' "[i]f doubts can [be] reasonably resolved in favor of the use of [the] reserve initiative power, courts will preserve it." ' " (*VFRR, supra,* 8 Cal.4th at pp. 776-777, quoting *Associated Home Builders, supra,* 18 Cal.3d at p. 591.)

With this framework in mind, we turn to consideration of the present case.

C. *Elections Code Section 9111*

The County contends, and the Court of Appeal held, that Elections Code section 9111 specifically recognizes that general plans can be amended by initiative. We agree. That section, originally enacted in 1987 as Elections Code section 3705.5, provides in subdivision (a) that during the circulation of a countywide initiative petition, or before voting on whether to adopt an initiative measure, a board of supervisors "may refer the proposed initiative measure to any county agency or agencies for a report on any or all of the following: [¶] . . . [¶] [The proposed initiative's] effect on the *internal consistency* of the county's general and specific plans including the housing element, the consistency between planning and zoning," as well as certain other matters. (Elec. Code, § 9111, subd. (a), italics added.) The term "internal consistency" refers to the statutory requirement that the "general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies . . . ." (Gov. Code, § 65300.5; see *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 [212 Cal.Rptr. 273].) Initiatives that affect the "internal consistency of the general plan" must be those that amend the general plan. A land-use initiative that is not a plan amendment—for example an initiative to amend a zoning ordinance—can be inconsistent with the general plan but cannot affect the plan's internal consistency. (See, e.g., *Lesher Communications, supra,* 52 Cal.3d at p. 544.) The Legislature therefore clearly contemplated that general plans were to be amended by initiative, and established procedures to enable the board of supervisors to gain information regarding such amendments.

Elections Code section 9111 was part of a package of amendments (Assem. Bill No. 2202 (1987-1988 Reg. Sess.)) designed to better inform the county electorate and the board of supervisors about proposed initiatives.

Also included was the provision that a proposed initiative be submitted to county counsel prior to circulation for the preparation of an impartial title and summary. (Elec. Code, § 9105.) Assembly Bill No. 2202 was apparently intended to accomplish two objectives: (1) "to provide voters with an impartial analysis of proposed initiative measures"; and (2) to provide the board[6] and the electorate "the opportunity to make an informed decision on a proposed initiative . . . ." (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Dig. on Assem. Bill No. 2202 (1987-1988 Reg. Sess.) as amended May 4, 1987, p. 2.)

Plaintiffs contend Elections Code section 9111's reference to the "internal consistency of the general plan" should not be construed as evidence of legislative intent to permit general plan amendment initiatives. They argue that the views of the Legislature in 1987, when the predecessor to section 9111 was enacted, do not have bearing on the intentions of the earlier Legislatures that enacted the planning law. They cite *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, footnote 8 [185 Cal.Rptr. 582], for the proposition that "The Legislature has no authority to interpret a statute. That is a judicial task." Yet *Del Costello* is inapposite. In that case, the court rejected an argument that a 1980 statute construing a particular provision of the Government Code could be used to decide whether plaintiff was entitled to a 1979 state income tax refund. The court relied on the obvious proposition that a Legislature could not state definitively the meaning of a statute enacted by a previous Legislature so as to give it retroactive application. *Del Costello* did not suggest that the Legislature was barred from enacting a statute that would *prospectively* clarify or supplement a previously enacted statute. (*Ibid.*) In this case, all the relevant events occurred after the passage of the predecessor to Elections Code section 9111 in 1987, and *Del Costello* is therefore inapplicable.

Contrary to plaintiffs' assertion, therefore, the question is not whether Elections Code section 9111 in some fashion misconstrues the planning law, but rather how that statute can be *reconciled with* the planning law, specifically the provision governing a general plan's amendment found in Government Code section 65358, subdivision (a). When two statutes touch upon a common subject, they are to be construed in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." (*Mar* v. *Sakti Internat. Corp.* (1992) 9 Cal.App.4th 1780, 1784 [12 Cal.Rptr.2d 388]; see also *Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279

---

[6]Elections Code section 9116 provides that, once a board of supervisors is presented with a legally valid initiative petition, it may either "[p]ass the ordinance without alteration" or call a special election "at which the ordinance, without alteration, shall be submitted to a vote of the voters of the county."

Cal.Rptr. 613, 807 P.2d 455].) Two codes " 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' " (*Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749].) If Government Code section 65358 were construed, as plaintiffs contend, to prohibit general plan amendment by initiative, then the reference in Elections Code section 9111 to initiatives affecting the "internal consistency" of the general plan would be incomprehensible. General plan initiative amendments would be invalid *ab initio*. (See *Lesher Communications*, *supra*, 52 Cal.3d at p. 544 [zoning ordinance initiative beyond legal authority of voters to adopt is void at the time of its enactment].) There would be no need for the board to study an initiative's effect on the general plan's internal inconsistency when the initiative itself could not be lawfully put into effect.

Therefore, to construe both Government Code section 65358 and Elections Code section 9111 without surplusage in either statute, we must assume that the Legislature in 1987 acknowledged the fact that the general plan could be amended by initiative, and sought to establish a means by which the board and the electorate could gain information about such proposed initiatives and respond appropriately. The Legislature that passed the predecessor to Elections Code section 9111 could have addressed the problem of general plan amendment initiatives in a different manner: it could have prohibited such initiatives altogether. Instead, the Legislature chose to establish procedures designed to better equip the board and the electorate to evaluate this type of initiative. As such, Elections Code section 9111 is an unmistakable confirmation of legislative intent to allow general plans to be amended by initiative.[7]

### D. *Exclusive Delegation Under COST*

In addition to Elections Code section 9111, the planning law itself confirms that the Legislature did not intend to exclude the electorate from

---

[7]Plaintiffs further argue that there are types of initiatives that could affect the internal inconsistency of a general plan, but are not themselves plan amendments. They cite only one example of such initiative, derived from *Marblehead* v. *City of San Clemente* (1991) 226 Cal.App.3d 1504 [277 Cal.Rptr. 550]. That case concerned a purported general plan amendment initiative, Measure E, which declared that before a general plan could be amended or various other land use decisions could be made, the city would be required to find that these decisions would not adversely affect traffic circulation or certain city services according to certain stated criteria. Measure E also required the city council to amend the general plan to incorporate these land use concepts. The court held that Measure E was not a valid general plan amendment because the initiative did not amend the general plan directly, but merely directed the city council to amend the plan in accordance with the initiative's stated requirements. (*Id.* at p. 1510.) Thus, *Marblehead* presents an example not of an initiative other than a plan amendment affecting the internal consistency of the general plan, but rather of an *invalid* plan amendment.

the task of amending the general plan. Rather, as we suggested in *COST, supra*, 45 Cal. 3d at page 504, the amendment of a general plan is primarily a matter of local concern and therefore not one the Legislature can be supposed to have delegated exclusively to the local governing body.

As an initial matter, there is no question that a general plan amendment is a legislative act, for the planning law itself declares as much. (Gov. Code, § 65301.5.) Therefore it will be presumed that the general plan can be amended by initiative unless there is a "clear showing of [legislative] intent" to exclusively delegate the authority to amend the plan to the governing body. (*VFRR, supra*, 8 Cal.4th at p. 777.)

The statutory language of the planning law is by itself inconclusive on the question of exclusive delegation. Government Code sections 65356 and 65358 do, it is true, refer to the "legislative body" adopting and amending general plans. But as we observed in *COST*: "[m]any powers conferred by statute on the 'legislative body' of a local entity have been held to be subject to initiative and referendum." (45 Cal.3d at p. 504; see, e.g., *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 818-819 [226 Cal.Rptr. 81, 718 P.2d 68]; *Associated Home Builders, supra*, 18 Cal.3d 582; *Yost* v. *Thomas, supra*, 36 Cal.3d 561; *Arnel Development Co.* v. *City of Costa Mesa, supra*, 28 Cal.3d 511; *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826 [323 P.2d 71]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [270 P.2d 481].) *COST* does not hold that the use of the generic terms "legislative body" or "governing body" in a statute is alone sufficient to dispel the presumption in favor of the local right of initiative and referendum.

■ To determine whether the reference to "legislative body" signifies an intent to exclusively delegate authority to that body, we look to whether and to what extent the statute or statutory scheme in question pertains to matters of statewide concern. As we stated in *COST, supra*, 45 Cal. 3d 491, 501: "[A]n intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair." This is so because the Legislature's constitutional authority to restrict the local right of initiative or referendum generally derives from its partial preemption of local government authority pursuant to the fulfillment of a state mandate or objective. (See *COST, supra*, 45 Cal.3d at p. 511; *VFRR, supra*, 8 Cal.4th at p. 780.) Only in matters that transcend local concerns can the Legislature have intended to convert the city and county governing bodies into its exclusive agents for the achievement of a "legislative purpose of statewide import." (*VFRR, supra*, 8 Cal.4th at p. 780.)

But we never suggested in *COST* that courts are to automatically infer that a statutory scheme restricts the power of initiative or referendum merely

because some elements of statewide concern are present. In *Yost* v. *Thomas*, *supra*, 36 Cal.3d 561, as discussed above, we upheld a referendum on a land use plan amendment under the Coastal Act. That act establishes a regime of state regulation more intrusive than the planning law; it not only sets forth statewide planning goals (Pub. Resources Code, § 30200 et seq.), but, unlike the planning law, also dictates that the land use plan required by the act be approved by a state body, the Coastal Commission (*id.*, § 30512). In affirming the validity of the referendum, we stated: "There is no doubt that the Coastal Act is an attempt to deal with coastal land use on a statewide basis. Nor is it disputed that in matters of general statewide concern the state may preempt local regulation [citation]. However, state regulation of a matter does not necessarily preempt the power of local voters to act through initiative and/or referendum [citations]." (36 Cal.3d at p. 571; see also *City of Dublin* v. *County of Alameda* (1993) 14 Cal.App.4th 264, 280 [17 Cal.Rptr.2d 845] [California Integrated Waste Management Act, mandating city and county compliance with a number of statewide recycling goals, does not preclude adoption by initiative of a recycling plan required by the act].) As our decision in *Yost* illustrates, it is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decisionmaking implies a legislative intent to bar the right of initiative. Rather, courts must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body.

In some cases, exclusive delegation has been inferred as a means of promoting a particular regional project or intergovernmental relationship. (See *COST*, *supra*, 45 Cal.3d at p. 506 [construing statute providing funding mechanism for construction of major thoroughfares in Orange County through joint action of county and city governments]; *Riedman* v. *Brison* (1933) 217 Cal. 383, 387-388 [18 P.2d 947] [construing statute governing withdrawal from regional metropolitan water district].) In other cases, exclusive delegation was inferred in part on the grounds that the Legislature must have intended to prevent disruption of routine operations of government. (*Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 565 [11 Cal.Rptr. 340] [holding authority to create parking meter zones exclusively delegated]; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839-840 [313 P.2d 545] [referendum on local sales tax barred where an "essential government function[] would be seriously impaired"]; *Chase* v. *Kalber* (1915) 28 Cal.App. 561, 569-570 [153 P. 397] [local street improvement resolutions not subject to referendum].)

The amendment of a general plan, in contrast, is an act of formulating basic land use policy, for which localities have been constitutionally

endowed with wide-ranging discretion. "Land use regulation in California has historically been a function of local government under the grant of police power contained in California Constitution, article XI, section 7." (*Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 879 [170 Cal.Rptr. 342], fn. omitted.) We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state. (See, e.g., *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885-886 [218 Cal.Rptr. 303, 705 P.2d 876] [upholding a school facilities impact fee imposed by a county without statutory authorization]; *Birkenfield* v. *City of Berkeley* (1976) 17 Cal.3d 129, 140-142 [130 Cal.Rptr. 465, 550 P.2d 1001] [upholding city rent control initiative despite lack of express statutory authority].)

The Legislature, in its zoning and planning legislation, has recognized the primacy of local control over land use. It has declared that in enacting zoning laws, "it is its intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters." (Gov. Code, § 65800.) "The power of cities and counties to zone land use in accordance with local conditions is well entrenched. [Citations.] The Legislature has specified certain minimum standards for local zoning regulations [citation] but has carefully expressed its intent to retain the maximum degree of local control . . . ." (*IT Corp.* v. *Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 89 [2 Cal.Rptr.2d 513, 820 P.2d 1023].)

The planning law does not alter this local control over land use matters. In enacting the law, the Legislature found "that the diversity of the state's communities and their residents requires planning agencies and legislative bodies to implement this article *in ways that accommodate local conditions and circumstances, while meeting its minimum requirements.*" (Gov. Code, § 65300.7, italics added.) In other words, the planning law incorporates the state's interest in placing some minimal regulation on what remains essentially locally determined land use decisions. "[T]he Legislature has been sensitive to the fact that planning and zoning in the conventional sense have traditionally been deemed municipal affairs. It has thus made no attempt to deprive local governments . . . of their right to manage and control such matters, but rather has attempted to impinge upon local control only to the limited degree necessary to further legitimate state interests." (*City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 533 [187 Cal.Rptr. 893].)

The minimal regulation set forth in the planning law requires cities and counties to adopt a general plan with certain mandatory elements that will

generally govern "the future development, configuration and character of the city or county and require that future land use decisions be made in harmony with that general plan. [¶] . . . [¶] . . . [¶] Except for mandating the development of a plan, specifying the elements to be included in the plan, and imposing on the cities and counties the general requirement that land use decisions be guided by that plan, the Legislature has not preempted the decision making power of local legislative bodies as to the specific contours of the general plan or actions taken thereunder." (*Bownds* v. *City of Glendale, supra,* 113 Cal.App.3d at p. 880.) Even more than the Coastal Act in *Yost, supra,* 36 Cal.3d at page 573, the planning law, "leaves wide discretion to a local government . . . to determine the contents of its land use plans . . . ." As we found in *Yost* that the Coastal Act contains no implied restriction on the right of referendum, so we find now no implied limitation in the planning law to propose a general plan amendment by initiative.

The autonomy given to localities to amend their general plans is further confirmed by Government Code section 65700, subdivision (a), which sets forth precisely what "matters of statewide concern" are to be found in the planning law. That subdivision states: "The provisions of this chapter [pertaining to the planning law] shall *not* apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city; except that charter cities shall adopt general plans in any case, and such plans shall be adopted by resolution of the legislative body of the city, or the planning commission if the charter so provides, and such plans shall contain the mandatory elements required by Article 5 [Gov. Code, § 65302] . . . ." (*Ibid.,* italics added.)

In order to understand the significance of Government Code section 65700, subdivision (a), it will be recalled that the concepts of "statewide concern" and "municipal affair" originally arose in the context of determining whether state laws apply to charter cities. A charter city is constitutionally entitled to exercise exclusive authority over all matters deemed to be "municipal affairs." (Cal. Const., art. XI, § 5.) In such cases, the city charter supersedes conflicting state law. If the statute in question addresses an area of "statewide concern," however, then it is deemed applicable to charter cities. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 17 [283 Cal.Rptr. 569, 812 P.2d 916]; *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61-62 [81 Cal.Rptr. 465, 460 P.2d 137].) In deciding whether a matter is a municipal affair or of statewide concern, the Legislature's declared intent to preempt all local law is important but not determinative, i.e., courts may sometimes conclude that a matter is a municipal concern despite a legislative declaration preempting home rule. (*Bishop* v. *San Jose, supra,* 1 Cal.3d at p. 63.) But the inverse is not true: courts have

never declared a matter to be of statewide concern despite an express legislative declaration that charter cities were *not* to be covered by the law in question.

Thus, if a given statute governing local law is applicable to charter cities, then it ipso facto involves matters of statewide concern, and therefore is also some evidence, when coupled with reference to the "legislative" or "governing body," of legislative intent to exclude ballot measures. (See *COST*, *supra*, 45 Cal.3d at p. 501.) But Government Code section 65700, subdivision (a), by making clear that the planning law only applies certain minimal requirements to the general plans of charter cities, indicates a different legislative aim. As discussed above, the planning law contains a number of procedural provisions for amending general plans, including consultations with public agencies and meetings in front of the planning commission and legislative body. (Gov. Code, §§ 65350-65358.) Government Code section 65700, subdivision (a), makes plain, however, that none of the planning law's procedural requirements, except the provision that the plan be *adopted* by resolution of the legislative body or planning commission, apply to charter cities. The planning law distinguishes between the adoption of a plan and its amendment, and when its provisions are meant to apply both to adoption and amendment, they explicitly state so. (See, e.g., Gov. Code, §§ 65356, 65358.) Accordingly, Government Code section 65700, subdivision (a), leaves the nature of the general plan amendment process entirely to the discretion of charter cities. Because the Legislature implicitly declared that the process of plan amendment was *not* a matter of statewide concern, we have no reason to infer that it sought to control that process by precluding initiative amendments. In other words, the freedom given charter cities to control the general plan amendment process—including the freedom, presumably, to allow amendment by initiative if the city charter so provides —belies the claim that the Legislature intended to delegate the general plan amendment authority exclusively to local governing bodies in order to fulfill the statewide objectives of the planning law.

Plaintiffs argue that the mere fact that general plan amendments may have extra-local effects, in such areas as housing and traffic circulation, compels the conclusion that the Legislature intended to restrict the power of initiative. But this argument misreads prior case law. The probability that general plan amendments will have regional or statewide impacts certainly supports the contention that the Legislature possesses the *constitutional authority* to limit the power of initiative in this area if it chose to do so. (*COST*, *supra*, 45 Cal.3d at pp. 511-512.) But whether the Legislature actually intended to limit the power of initiative is another matter. Our examination of the planning law, with its deference to local autonomy, leads us to the conclusion that the Legislature had no such intention, and that therefore the land use element of a general plan can be amended by initiative.

E. *Arguments by Plaintiffs*

1. *Procedural Arguments*

Plaintiffs argue that the intent to bar initiative amendments to the general plan can be inferred from the numerous procedural requirements for adopting and amending general plans, as set forth above. In essence, plaintiffs contend that the general plan process requires not only that the amendment be approved by the legislative body, but also that it be prepared by the local planning agency and reviewed by the planning commission. Moreover, plaintiffs point to statutory requirements that the planning agency consult with other public agencies and the public at large when a general plan amendment is being prepared. The exercise of the initiative power circumvents these preparation and review procedures and cannot have been intended, they argue, by the Legislature. For a number of reasons, we disagree.

First, as discussed above, the procedural provisions for amending the general plan do not apply to charter cities. (Gov. Code, § 65700, subd. (a).) Since the Legislature did not consider these statutory procedures of sufficient statewide importance to impose on charter cities, it is highly doubtful that it intended to give them precedence over the constitutional right to initiative.

Second, it is well established in our case law that the existence of procedural requirements for the adoptions of local ordinances generally does not imply a restriction of the power of initiative or referendum. (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d 810, 823-824; *Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d 511, 524-525; *Associated Home Builders, supra,* 18 Cal.3d at pp. 593-596; see also *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 251 [279 Cal.Rptr. 325, 806 P.2d 1360].) As we stated in *Associated Home Builders,* in rejecting the claim that an initiative to amend a city zoning ordinance was barred because the initiative could not meet the statutory notice and public hearing requirements for amending such ordinances: "Procedural requirements which govern *council* action . . . generally do not apply to initiatives, any more than the provisions of the initiative law govern the enactment of ordinances in council. No one would contend, for example, that an initiative of the people failed because a quorum of councilmen had not voted upon it, any more than one would contend that an ordinary ordinance of a council failed because a majority of voters had not voted upon it." (*Associated Home Builders, supra,* 18 Cal.3d 582, 594, fn. omitted, italics in original.)

Similarly, in *Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d 810, we found Government Code section 65863.6, which requires a city or

county that adopts a growth control ordinance to "consider the effect" on local housing needs and to make findings that public welfare benefits of such ordinances justify the restriction of housing opportunities, to be inapplicable to growth control initiative ordinances. As we stated: "Section 65863.6 establishes guidelines that can be carried out by a city or county government, but which reasonably cannot be satisfied by the initiative process. For this reason, we conclude that the section does not apply to initiative measures. To hold otherwise would place an insurmountable obstacle in the path of the initiative process and effectively give legislative bodies the only authority to enact this sort of zoning ordinance." (41 Cal.3d at p. 824.)

■ These cases exemplify the rule that statutory procedural require- ments imposed on the local legislative body generally neither apply to the electorate nor are taken as evidence that the initiative or referendum is barred. The rule is a corollary to the basic presumption in favor of the electorate's power of initiative and referendum. When the Legislature enacts a statute pertaining to local government, it does so against the background of the electorate's right of local initiative, and the procedures it prescribes for the local governing body are presumed to parallel, rather than prohibit, the initiative process, absent clear indications to the contrary.

■ With this rule in mind, we turn to the particular procedural provi- sions found in the planning law. As stated above, the process for amending the general plan is principally that of holding noticed public hearings before the planning commission and legislative body. (Gov. Code, §§ 65353- 65355.) These are precisely the procedures we found consistent with the right of initiative in *Associated Home Builders, supra*, 18 Cal.3d at page 596.

Nor do we infer from Government Code section 65351, prescribing public participation during the formulation of a general plan amendment, an intent to preclude amendment by initiative. We find it highly doubtful that the Legislature, in the name of these nonspecific requirements for obtaining community input on general plan amendments, sought to prohibit this most direct form of such input—amendment by initiative. Obviously, when the governing body votes on a general plan amendment, the expression of public opinion on the amendment must come before that vote. When the people exercise their right of initiative, then public input occurs in the act of proposing and circulating the initiative itself, and at the ballot box. We cannot conclude that, for the sake of eliciting public involvement, the Legislature intended to preclude this more direct form of public participation.

Nor do we find the statutory provisions regarding consultation with public agencies prior to the enactment of general plan amendments to implicitly bar

the initiative. Government Code section 65352 does provide that any "substantial amendment" to the general plan "shall" be referred to various public agencies. But, as stated above, subdivision (c)(1) of that section makes clear that these referral provisions are "directory, not mandatory," and the failure to consult with the public agencies "does not affect the validity" of a general plan amendment. (Gov. Code, § 65352, subd. (c)(1).) The most reasonable inference from this provision is that the Legislature, by making the statutory consultation provisions directory, intended that such provisions not "place an insurmountable obstacle in the path of the initiative process . . . ." (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at p. 824.) The cases cited above demonstrate the principle that most mandatory procedures imposed on local governing bodies generally cannot be taken to prohibit the right of initiative. Still less can these nonmandatory requirements be construed as implied initiative restrictions.

Nor do we take the injunction contained in Government Code section 65103, subdivision (a), that planning departments prepare, review and periodically revise the general plan to bar the right of initiative. The planning law nowhere requires that amendments to the general plan must be initially prepared by the planning agency. Rather, Government Code section 65358, subdivision (a) declares that "[a]n amendment to the general plan shall be initiated in the manner specified by the legislative body."[8] Nothing in Government Code section 65103, subdivision (a) suggests that a general plan amendment that has not been prepared or reviewed by a planning department is invalid.

In sum, none of the procedural requirements imposed on the legislative body by the planning law can be presumed to limit the right to amend the general plan by initiative.[9]

---

[8]Plaintiffs also contend that this language in Government Code section 65358, subdivision (a), implies a prohibition of the right of initiative. We disagree. In view of the foregoing discussion, we presume that the Legislature intended to give local governing bodies the authority to establish procedures for initiating general plan amendments that come before them, rather than the authority to bar initiatives.

[9]We also disagree with plaintiffs' argument that Government Code section 65356, because it prescribes that the general plan shall be amended "by resolution," indicates a legislative intent to bar the initiative. Although, as plaintiffs point out, Elections Code section 9118 and related sections only refer to "ordinances" being enacted by initiative, it is well established that any legislative act may be enacted by initiative and may be subject to referendum, regardless of whether that act is denominated an "ordinance" or "resolution." (*Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 609-610 [150 P. 977]; *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 781-782 [269 Cal.Rptr. 796]; *Stanislaus Area Farm Economy* v. *Board of Supervisors, supra,* 13 Cal.App.4th 141, 153; see also *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 710 [206 Cal.Rptr. 89, 686 P.2d 609] [state initiatives can only enact statutes, not resolutions, but whether an initiative enacts a statute or

## 2. *Flexibility of General Plan Amendment and the Initiative Process*

■ Government Code section 65358, subdivision (a), authorizes the legislative body to amend the general plan when it "deems it to be in the public interest." Elections Code section 9125, on the other hand, provides that no initiative adopted by either the voters or the board of supervisors "shall be repealed or amended except by a vote of the people, unless provision is otherwise made in the original ordinance." Plaintiffs claim that Elections Code section 9125, by forbidding the board of supervisors to further amend general plan amendments that have been enacted by initiative, interferes with the board's authority to amend the general plan whenever it is in the "public interest" to do so, and could not have been what the Legislature intended. Plaintiffs therefore conclude that the Legislature must not have contemplated general plan amendment by initiative. We disagree.

As discussed above, the planning law is intended to grant a large degree of legislative discretion to local jurisdictions in the general plan amendment process. The governing body's power to amend the general plan in Government Code section 65358, subdivision (a) is stated as a discretionary authority, rather than a mandatory duty. It is true that "[l]ocal agencies must periodically review and revise their general plans as circumstances warrant . . . ." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 572 [276 Cal.Rptr. 410, 801 P.2d 1161].) But, with one exception discussed below, there is no statutory requirement that the general plan be revised according to any particular schedule. (*Garat* v. *City of Riverside, supra,* 2 Cal.App.4th 259, 296.)

On the other hand, Elections Code section 9125 has its roots in the constitutional right of the electorate to initiative, ensuring that successful initiatives will not be undone by subsequent hostile boards of supervisors. Although Elections Code section 9125 limits a board's authority to pass general plan amendments, it is true that *all* initiatives place limits on a governing body's capacity to legislate in areas that are otherwise statutorily authorized, some of those limitations quite severe. In *Associated Home*

a resolution is determined by the content, rather than the label, of the initiative].) Thus in *Yost,* we upheld the validity of a referendum on a resolution adopting a general plan amendment, identifying the relevant inquiry as whether the resolution was a "legislative act." (*Yost, supra,* 36 Cal.3d at p. 570.) We therefore agree with the court in *Stanislaus Area Farm Economy* v. *Board of Supervisors, supra,* 13 Cal.App.4th 141, 153, that Elections Code section 9118 does not implicitly prohibit initiatives performing legislative acts, such as general plan amendments, merely because such acts are statutorily designated as resolutions when passed by the local governing body. This construction of section 9118 is particularly supported by the fact that, as discussed above, a provision in the same article of the Elections Code— section 9111—*specifically* provides for plan amendment initiatives.

*Builders, supra,* 18 Cal.3d 582, for example, we approved a growth-control zoning ordinance that put severe restrictions on a city council's legislatively authorized power to amend its zoning laws. (See, Gov. Code, § 65853.) Because of the presumption in favor of the right of initiative, "restrictions on the right are not read into the statutes." (*Coalition for Fair Rent* v. *Abdelnour* (1980) 107 Cal.App.3d 97, 104 [165 Cal.Rptr. 685].) In this case we do not interpret the grant of discretionary legislative authority to amend general plans found in Government Code section 65358, subdivision (a), as an implied limitation on the right of initiative.

Plaintiffs argue, nonetheless, that the rigidity of a general plan initiative amendment frustrates the basic purposes of the planning law. They claim that one of the hallmarks of good planning is that it be "flexible and responsive to changing circumstances and values." (Curtin & Jacobson, *Growth Control by the Ballot Box: California's Experience* (1991) 24 Loyola L.A. L.Rev. 1073, 1102.) A static general plan is one that will be ineffective and eventually obsolete. Since legislation should be construed to effectuate its purpose (*Dubois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978]), plaintiffs contend that Government Code section 65358, subdivision (a), should not be construed to permit initiative amendments to the general plan. They argue that such amendments, by tying the hands of subsequent boards to amend the plan as conditions warrant, would thwart the dynamism and flexibility inherent in the planning law, and could not have been what the Legislature meant.

It is certainly true that "[w]hen uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." (*Harris* v. *Capitol Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166 [278 Cal.Rptr. 614, 805 P.2d 873].) But, as explained below, general plan amendment by initiative is not inherently inconsistent with the planning law's expressed purposes.

There is no doubt that some degree of flexibility is desirable in the planning process. On the other hand, it is also desirable that plans possess some degree of stability so that they can be "comprehensive [and] long-term" guides to local development. (Gov. Code, § 65300; see also Perry, *The Local "General Plan" in California* (1971) 9 San Diego L.Rev. 1, 5-6.) As we stated in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111], in explaining the rationale behind general and specific plans: "The deleterious consequences of haphazard community growth in this state and the need to prevent further random

development are evident to even the most casual observer. The Legislature has attempted to alleviate the problem by authorizing the adoption of long-range plans for orderly progress."

Commentators have noted the tension between the ideal of the general plan as a long-range vision of local land use, and the reality that general plans are often amended in a fragmentary fashion to accommodate new development. One survey of California city and county planning departments shows that approximately 75 percent of proposed planning and zoning amendments are privately initiated in conjunction with development applications, and that approximately 66 to 75 percent of these amendments are ultimately approved. (Dalton, *Limits of Regulation: Evidence from Local Plan Implementation in California* (1989) 55 J. Am. Planning Assn., 151, 156, 159 [hereafter *Limits of Regulation*]; see also Fulton, Guide to California Planning (1991) p. 66; Glickfeld, Local Initiatives in the 90s: Coming to Terms with an Imperfect Voice of Democracy in 1 Land Use Forum (Cont.Ed.Bar 1992) pp. 99, 100 [hereafter Local Initiatives in the 90's]; and see, e.g., *Yost v. Thomas, supra,* 36 Cal.3d at p. 569; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 156-157 [217 Cal.Rptr. 893].) As the author of that survey has concluded, the planning and zoning amendment process has become in many communities one of "piecemeal adjustment" by local planners and local legislators in response to development pressures. (*Limits of Regulation, supra,* 55 J. Am. Planning Assn. at pp. 151, 159.) This conclusion comports with the well-known phenomenon commonly referred to as the "fiscalization of land use," whereby planning decisions are frequently driven by the desire of local governments to approve development that will compensate for their diminished tax base in the post-Proposition 13 era. (See Fulton, Guide to California Planning, *supra,* at pp. 15-17, 208-213.) It was presumably to curb an excessively ad hoc planning process that the Legislature limited in 1984 the number of amendments to any mandatory element of the general plan to four per year. (Gov. Code, § 65358, subd. (b).) General plans that change too frequently to make room for new development will obviously not be effective in curbing "haphazard community growth." (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 120.)

The planning law leaves it largely to each locality to balance the competing values of flexibility and stability in the planning process. The law allows cities and counties the discretion to determine how often a general plan is to be amended, with two exceptions: (1) that the housing element of the general plan must be amended at least once every five years (Gov. Code, § 65588, subd. (b)); and (2) as stated above, with certain narrow exceptions, amendments to a mandatory element of the general plan are limited to four per

year. (Gov. Code, § 65358, subd. (b).) This discretion in deciding the frequency of plan amendment is consistent with the local autonomy that is, as we have seen, central to this state's planning law.

General plan amendments such as the County's Measure J are one response to what some localities view as unwelcome development pressures. (See, Local Initiatives in the 90's, *supra*, at pp. 99-100.) The purpose of the initiative, as articulated in an amicus curiae brief by the cities of Napa County (the Cities) in support of the County, is to protect agricultural land from the encroachment of suburban development. The phenomenon of sprawling development has been identified as a serious land use problem in this state. (See, e.g., Bank of America et al., Beyond Sprawl: New Patterns of Growth to Fit the New California (1995) [report examining the increasing economic and environmental costs of suburban sprawl and calling for fundamental changes in state growth patterns]; *Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 850 [171 Cal.Rptr. 619, 623 P.2d 180].) Moreover, the particular need for the long-term protection of agricultural land has been recognized both by the Legislature and by this court. The Williamson Act, Government Code section 52100 et seq., authorizes 10-year contracts between local government and local landowners to preserve agricultural land in exchange for reduced property taxes. (See *Sierra Club* v. *City of Hayward*, *supra*, 28 Cal.3d at pp. 850-853.) The long-term protection of agricultural land is necessary, the Cities argue, to encourage productive investment in farming enterprises. Farmers fearing the encroachment of development incompatible with agricultural uses and the resultant increase in property taxes will not make the substantial investment in capital equipment, such as irrigation systems, required for a successful farming operation. (See Nelson, *Preserving Prime Farmland in the Face of Urbanization* (1992) 58 J. Am. Planning Assn. 467, 469.) The preservation of agricultural land, the Cities therefore contend, must be secured in the long term in order to make farming of the land viable.

Measure J does not eliminate the ability of local governing bodies to accommodate new development. As explained at greater length in part III of this opinion, Measure J does not, and indeed cannot, interfere with the ability of cities to annex adjacent territory, because the municipal annexation of land is a matter of statewide concern beyond the reach of the initiative process. (*Ferrini* v. *City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 248-249 [197 Cal.Rptr. 694].) Measure J, therefore, rather than putting a stop to growth within Napa County, seeks to channel such growth towards already developed areas rather than permitting a "leapfrog" pattern of development.

Measure J is, in short, an attempt to manage growth so as to protect both Napa County's environment and its economically productive resources in

accordance with the county's unique local conditions. Recognizing the reality that general plan amendments often follow rather than lead development, the electorate of Napa County has sought to ensure a greater stability in land use policy than shifting political and economic currents might otherwise provide. We cannot say whether Measure J is the best policy for the County, or for the state. But we also cannot say that the measure, as it comes to us today, thwarts the basic purposes of the planning law. On the contrary, it appears to be a reasonable attempt to effectuate those purposes by delineating a long-range policy intended to guide the county's development, curb haphazard growth, and promote desired land uses. (See *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 120.) Accordingly, we find no basis for plaintiffs' contention that this general plan amendment initiative, or amendment initiatives in general, inherently frustrate the fundamental objectives of the planning law.

Our ruling today does not imply that localities may allow their general plans to become obsolete. Indeed, since the passage of Measure J, the Napa County General Plan has continued to be amended and updated, as the trial court found. It is of course conceivable that the Napa County General Plan will, as the result of Measure J, fall so far behind changing local conditions that the County will fail to fulfill an implied statutory duty to keep its general plan current. (See *Garat* v. *City of Riverside, supra,* 2 Cal.App.4th 259, 296, fn. 28.) But as we said in *Yost, supra,* 36 Cal.3d at page 574, in considering whether the exercise of the referendum would frustrate the implementation of the land use plan (LUP) of a local coastal plan: "True, if down the road the people exercise their referendum power in such a way as to frustrate any feasible implementation of the LUP, some way out of the impasse will have to be found. At this point, however, the system is not being put to so severe a test."

So it is in this case. The planning agency will continue to be able to review and propose revisions to the plan pursuant to Government Code section 65103, subdivision (a), and the board of supervisors will continue to amend the general plan in ways that do not conflict with the provisions of Measure J. If a future board determines that a part of the general plan enacted by voter initiative must be amended for the sake of general plan currency, then the board can propose such an amendment to the electorate, as Measure J provides.[10] We should not presume—nor, given the rule that doubts should be resolved in favor of the initiative and referendum power,

---

[10]The dissent refers to the "logical impossibility of reconciling the initiative process with the planning agency's express statutory mandate [under Gov. Code, § 65103, subd. (a)] to periodically review and *revise,* as necessary, the general plan." (Dis. opn., *post,* at p. 805.) No *such logical* impossibility exists. First it is clear, when Government Code section 65103,

should we assume the Legislature presumed—that the electorate will fail to do the legally proper thing. We see no reason to suppose that, if Measure J at some point causes the Napa County General Plan to become inadequate—a scenario that is by no means inevitable—the electorate will not approve a proper corrective amendment proposed by the board. If, down the road, the electorate fails to act appropriately, courts may then be asked to intervene to remedy deficiencies in the general plan, as they would likely act if the board itself failed to properly revise the general plan. But we cannot infer from the mere possibility that such deficiencies may occur an intent to categorically ban general plan amendment initiatives.[11]

### 3. *Lack of Environmental Review*

Plaintiffs argue that the Legislature intended all general plan amendments to undergo environmental review, and that because initiatives are exempt from such review, the Legislature must not have contemplated amendment of the general plan by initiative. We find this argument also without merit.

General plan amendments are indeed generally subject to environmental review under the California Environmental Quality Act (CEQA), Public

---

subdivision (a), is read in conjunction with Government Code section 65358, subdivision (a), that the planning agency has no authority to revise the general plan of its own accord, but only the authority to propose revisions to the planning commission and the legislative body. The legislative body, of course, is not obliged to adopt the planning agency's recommendations. All revisions proposed by the planning agency must undergo the general plan amendment process described in Government Code sections 65350-65358. Measure J does not prevent the planning agency from proposing revisions, nor the legislative body from adopting amendments incorporating those revisions, but merely provides that such amendments, if they are inconsistent with Measure J, must be approved by the voters.

It is therefore no more "logically impossible" for a local planning agency to continue to propose amendments to the general plan in the face of Measure J's voter approval requirements than it is impossible for the agency to propose such amendments in the face of the voters' right to disapprove general plan amendments by their exercise of the power of refererendum. (See *Yost* v. *Thomas, supra,* 36 Cal.3d 561, 570.) In both instances, revision of the general plan is possible, and in both instances, proposed revisions may ultimately be vetoed by the local electorate. Only if the electorate's persistent refusal to ratify proposed amendments renders the plan substantively deficient may the courts be forced to intervene. (*Yost, supra,* 36 Cal.3d at p. 574.)

[11]In deciding today that the land use element of the general plan may be amended by initiative, we have no occasion to consider whether the same is true for the housing element. As noted above, the housing element, unlike the other mandatory elements, must be amended according to a fixed schedule—at least once every five years. (Gov. Code, § 65588, subd. (b).) Moreover, any draft amendment to the housing element must be submitted to the State Department of Housing and Community Development for review and comments. (Gov. Code, § 65585.)

In the present case, Measure J neither purports to amend the housing element nor was found inconsistent with it. Thus, we do not decide the status of an initiative that either amends or conflicts with the housing element of a general plan.

Resources Code section 21000 et seq. (*City of Santa Ana* v. *City of Garden Grove, supra,* 100 Cal.App.3d at pp. 533-534.) Although not explicitly mentioned in the CEQA statutes, general plans "embody fundamental land use decisions that guide the future growth and development of cities and counties," and amendments of these plans "have a potential for resulting in ultimate physical changes in the environment." (*Id.* at p. 532.) General plan adoption and amendment are therefore properly defined in the CEQA guidelines (Cal. Code Regs., tit. 14, § 15378, subd. (a)(1)) as projects subject to environmental review. (100 Cal.App.3d at p. 534.)

On the other hand, the CEQA guidelines specifically exempt initiatives from environmental review. (Cal. Code Regs., tit. 14, § 15378, subd. (b)(4); see also *Northwood Homes, Inc.* v. *Town of Moraga, supra,* 216 Cal.App.3d at pp. 1206-1207; *Stein* v. *City of Santa Monica* (1980) 110 Cal.App.3d 458 [168 Cal.Rptr. 39].) Instead, as discussed in part II.C. of this opinion, Elections Code section 9111 allows for an assessment of county ballot measures, including a review of a measure's effect on the current general plan, specific plan, zoning, affordable housing goals, and any other matters the board of supervisors deems to be of interest. This section would permit the board of supervisors to inquire into the environmental impacts of a proposed initiative to the extent consistent with the time requirements of the initiative process.

Several attempts have been made to amend the Elections Code in the years following the 1987 enactment of the predecessor to section 9111 to require environmental scrutiny. Assembly Bill No. 4678, 1987-1988 Regular Session, as introduced on March 1, 1988, would have subjected all initiatives considered "projects" under Public Resources Code section 21065—which, as we have noted, includes general plan amendments—to environmental review after the initiative was approved. The initiative would become effective only on the filing of a notice of approval of an environmental impact report or other document required under Public Resources Code section 21152, subdivision (a). These environmental review provisions were never enacted.

Assembly Bill No. 628, 1989-1990 Regular Session, would have required that all proposed local land use initiatives be referred to the Governor's Office of Planning and Research for extensive environmental and economic analysis before being submitted to the voters. Moreover, Assembly Bill No. 628 would have allowed the local legislative body to place amendments to the proposed initiative concurrently on the ballot. Assembly Bill No. 628 also contained a declaration that local land use initiative measures "are not matters of purely local concern. They are matters in which there is a

statewide interest and matters which may have effects beyond the jurisdictional limits of the local agency." (Assem. Bill No. 628, 1st reading Feb. 14, 1989 (1989-1990 Reg. Sess.) § 1.) These provisions were also never enacted into law. In its final form, Assembly Bill No. 628 simply required the county clerk to file a periodic report on the number of petitions circulated and adopted by voters. (See Elec. Code, § 9112.)

While only limited inferences can be drawn from bills that the Legislature failed to enact (see *Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 922-923 [16 Cal.Rptr.2d 226, 844 P.2d 545]), the defeat of attempts to impose more stringent environmental review requirements on land use initiatives provides additional corroboration that the Legislature did not intend such requirements to obstruct the exercise of the right to amend general plans by initiative. Elections Code section 9111 represents a legislative effort to balance the right of local initiative with the worthy goal of ensuring that elected officials and voters are informed about the possible consequences of an initiative's enactment. It permits public agencies to conduct an abbreviated environmental review of general plan amendments and other land use initiatives in a manner that does not interfere with the prompt placement of such initiatives on the ballot. Plaintiffs would have us redraw this legislative compromise by concluding that environmental review is mandatory in the case of general plan amendments, and that therefore such amendments cannot be enacted by initiative. We decline to engage in such legislation by judicial fiat.

In conclusion, we find none of plaintiffs' arguments against the validity of general plan initiative amendments to be persuasive. Although we have focused in the above discussion primarily on legislative intent, it is worth recalling the probable intention of those who framed and adopted the 1911 amendments granting the rights of initiative and referendum. As is too well known to merit recounting, the major impetus behind these amendments was to enable the people of this state, on the local level and statewide, to reclaim the legislative power from the influence of what in contemporary parlance is called the "special interests." (See Key & Crouch, Initiative and Referendum in Cal. (1938) pp. 431-434.) So the voters of Napa County have attempted to do with Measure J and, regardless of the wisdom of the initiative, article II, section 11 of the California Constitution guarantees their right to do so absent the clear indication that the Legislature intended to preempt that power pursuant to a statewide purpose. As shown above, none of plaintiffs' arguments convincingly demonstrates such intent. Nor do their arguments overcome the persuasive force of Elections Code section 9111. We therefore

conclude that the land use element of a general plan can be amended by the exercise of the local right of initiative.[12]

### III. THE VALIDITY OF THE 30-YEAR TERM OF MEASURE J AND ITS VOTER APPROVAL PROVISIONS

Plaintiffs contend that even if general plan amendments by initiative are generally valid, the particular initiative in question in this case—Measure J—is unlawful because of its mandatory voter approval requirements. As stated above, Measure J adds section 9 to the land use element of the general plan. That section provides that, with certain exceptions, the land use designations enacted by initiative can be changed during a 30-year period only by a majority vote of the county electorate. We do not agree that these voter approval provisions render Measure J invalid.

As discussed above, Elections Code section 9125 provides that initiative measures cannot be repealed "except by a vote of the people, unless provision is otherwise made in the original [initiative] ordinance." Thus, if the 30-year voter-approval provisions had not been included in Measure J, redesignation of the land included in that measure could have been accomplished only by voter approval in any case. Section 9 of Measure J merely formalizes the voter approval requirement implied by Elections Code section 9125 and limits the term such requirement will remain in effect.

In *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582] (hereafter *Builders Assn. of Santa Clara-Santa Cruz Counties*), we upheld the validity of an initiative freezing for two years the rezoning of certain designated land as residential unless certain conditions were met. As we stated: "The courts . . . have upheld the right of residents of charter cities, in enacting zoning initiatives, to bar the city council from altering or repealing the zoning established by the initiative. [Citations.] We see no difference in principle between an initiative which bars a city council from repealing newly enacted

---

[12]We emphasize that an initiative amendment must conform to all the formal requirements imposed on general plan amendments enacted by the legislative body. The amendment itself may not be internally inconsistent, or cause the general plan as a whole to become internally inconsistent (Gov. Code, § 65300.5), or to become insufficiently comprehensive (*id.*, § 65300), or to lack any of the statutory specifications for the mandatory elements of the general plan set forth in Government Code section 65302. (See *Garat* v. *County of Riverside, supra,* 2 Cal.App.4th at pp. 293-294.) If a general plan amendment is substantively deficient, then it may be challenged on that basis, and courts have sufficient remedies to correct the problem. (See *Concerned Citizens of Calaveras County* v. *Board of Supervisors, supra,* 166 Cal.App.3d 90, 103-104.) When matters of substance rather than procedure are concerned, courts will not employ a double standard for initiative amendments and general plan amendments enacted by the legislative body.

zoning restrictions, and one which freezes existing restrictions; either, to be effective, must limit the power of a hostile city council to evade or repeal the initiative ordinance." (*Id.* at pp. 230-231.) Likewise, Measure J freezes certain land use designations and limits the power of a hostile board of supervisors to repeal or evade the terms of the measure.

Plaintiffs argue that the present case is distinguishable from *Builders Assn. of Santa Clara-Santa Cruz Counties* because the planning law, unlike the zoning law in the latter case, expressly provides in Government Code section 65358, subdivision (a), that the legislative body may amend a general plan whenever it deems it to be in the public interest. But, as explained in part II.E.2. of this opinion, *ante*, we are unable to discern in Government Code section 65358, subdivision (a), any intention to limit the power of local initiative. Neither can we discern a design in the planning law to limit the operation of Elections Code section 9125 in prohibiting supervisorial repeal of initiatives.

Plaintiffs would also have us distinguish *Builders Assn. of Santa Clara-Santa Cruz Counties* because the latter entailed a two-year freeze, while Measure J provides for thirty years. But we have no principled basis for converting this quantitative distinction into a qualitative one. Elections Code section 9125 sets no limit on the length of time an initiative can remain in force, and the 30-year period set by Measure J is lawful.

Plaintiffs cite *L.I.F.E. Committee* v. *City of Lodi* (1989) 213 Cal.App.3d 1139 [262 Cal.Rptr. 166] (hereafter *L.I.F.E. Committee*) for the proposition that voter approval provisions for future general plan amendments are unlawful. That case is inapposite. In *L.I.F.E Committee*, a city voter initiative sought to protect a green belt area outside the city limits but within the city's "sphere of influence." The primary mechanism for accomplishing such protection was to require that the municipal annexation of any land in the green belt area be conditional upon voter approval of a corresponding general plan amendment. The court held that the initiative impermissibly interfered with the statutorily mandated scheme for annexation of land set forth in the predecessor to the Cortese-Knox Local Government Reorganization Act of 1985 (Cortese-Knox Act). (Now at Gov. Code, § 56000 et seq.) That act provides "the sole and exclusive authority and procedure for the initiation, conduct, and completion of changes of organization and reorganization for cities and districts." (*Id.*, § 56100.) The Cortese-Knox Act permits a veto of an annexation by the city electorate only under certain limited circumstances. (Gov. Code, § 57075.) The court concluded, following the decision in *Ferrini* v. *City of San Luis Obispo, supra*, 150 Cal.App.3d 239, 246, that the Legislature intended to occupy the field with regard to annexation, and that accordingly any city ordinance prescribing voter approval

provisions different from those found in state annexation law was pre-empted. (*L.I.F.E. Committee, supra,* 213 Cal.App.3d at pp. 1147-1148.) What the *L.I.F.E Committee* court found unlawful, therefore, was not voter approval provisions for general plan amendments as such, but rather those that obstructed municipal annexations. Measure J, however, explicitly exempts from its voter approval requirements any redesignation of agricultural land resulting from municipal annexation, and therefore does not contravene the provisions of Cortese-Knox Act.

Plaintiffs cite cases concluding that certain initiatives imposing voter approval requirements on local legislative action were invalid. (*Citizens for Responsible Behavior* v. *Superior Court* (1991) 1 Cal.App.4th 1013 [2 Cal.Rptr.2d 648] (hereafter *Citizens for Responsible Behavior*); *City and County of San Francisco* v. *Patterson* (1988) 202 Cal.App.3d 95 [248 Cal.Rptr. 290] (hereafter *Patterson*).) These cases also do not support plaintiffs' position. In *Citizens for Responsible Behavior* the court considered an initiative ordinance that sought to broadly restrict, except by voter approval, the power of the city council to enact sexual orientation or AIDS anti-discrimination measures. (*Citizens for Responsible Behavior, supra,* 1 Cal.App.4th at pp. 1039-1040.) The court, in addition to holding the measure violated the equal protection clauses of the United States and California Constitutions, as well as other constitutional provisions, also concluded that the initiative was an unlawful attempt to amend the Riverside City Charter by ordinance. The court reasoned that "[u]nder the city charter, the city council now has plenary power to address issues of discrimination . . . ." (*Id.* at p. 1034.) "While a city charter may be amended by a majority of the electorate (Cal. Const., art. XI, § 3), an ordinance cannot alter or limit the provisions of a city charter." (*Ibid.*) Therefore, an initiative ordinance purporting to circumscribe the power of the city council to address a broad range of discrimination issues "is a disguised, and illegal, attempt to amend the city charter." (*Ibid.*) A similar conclusion was reached in *Patterson, supra,* 202 Cal.App.3d at pages 102-105, with respect to an initiative ordinance that inter alia sought to limit the City of San Francisco's ability to lease or sell real property without voter approval.

The present case is distinguishable from *Citizens for Responsible Behavior* and *Patterson* in an important respect. It may indeed be the case that initiative ordinances broadly limiting the power of future legislative bodies to carry out their duties pursuant to either a governing charter or their own inherent police power, are, as it were, "constitutional" rather than legislative measures. Such measures may therefore be either improper amendments to a city or county charter, or else may improperly create a charter-like provision in a city or county that does not possess one. But if the electorate enacts a

legislative measure the governing body could have itself enacted, then such measure may, pursuant to Elections Code section 9125, circumscribe the power of future governing bodies. Thus Measure J, which amends a portion of the land-use element of the County's general plan—a legislative act— may properly restrict the power of subsequent boards of supervisors incident to that enactment, and may provide formal, limited voter approval requirements as a means of implementing that restriction.

We therefore find the voter approval provisions of Measure J to be lawful.

### IV. Disposition

For all of the foregoing, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., George, J., and Werdegar, J., concurred.

**ARABIAN, J.**—I dissent.

The question before the court is whether a county's comprehensive general plan for land use and development may be amended by initiative. The issue turns on the meaning to be accorded certain provisions of the Planning and Zoning Law (Gov. Code, § 65000 et seq.)[1] (planning law) which vest specific authority over general plan amendments in the local "legislative body." Although any limitation on the initiative power must be scrutinized with special care, evidence that the Legislature meant exactly what it said when it delegated specific authority to the local representative body is—as I will demonstrate below—compelling and irrefutable. Indeed, the problems of logic and practical planning that arise from a contrary conclusion are prominently displayed by the majority, which expends considerable time and effort attempting to rationalize the anomalous consequences of its own analysis. That effort, unfortunately, is fundamentally misplaced, for as this court has frequently observed, the remedy for inconvenient or unpopular laws lies with the Legislature, not the courts.

### Discussion

A. *Elections Code Section 9111*

It is telling that the majority begins its analysis not with the language, structure and history of the planning law, but with a temporally and textually unrelated provision of the Elections Code. The latter, Elections Code section 9111, was part of a package of amendments first enacted in 1987 (50 years

---

[1]All further statutory references are to the Government Code unless otherwise noted.

after enactment of the original planning law and 30 years after the last substantial amendments to the law) to revise the *notice* provisions governing local initiatives. A new section was added requiring that proponents of initiative measures file a copy of the proposed measure with the county clerk (Elec. Code, § 9103, added by Stats. 1987, ch. 767, p. 2434), and another requiring that county counsel provide a ballot title and summary. (Elec. Code, § 9104, added by Stats. 1987, ch. 767, pp. 2434-2435.)

Once an initiative petition containing the requisite number of signatures is submitted to the county clerk, the law requires that the board of supervisors either enact the proposed ordinance without alteration, or submit it to the voters. (Elec. Code, § 9116.) Elections Code section 9111 created an additional step in the process by authorizing the board to submit a proposed initiative measure to any county agency for a report on its fiscal impact, its "effect on the internal consistency of the county's general plan and specific plans including the housing element, the consistency between planning and zoning," or any other matters requested by the board.

The majority claims that the reference in Elections Code section 9111 to "internal consistency of the county's general plan" provides decisive evidence of the Legislature's intention to subject general plans to amendment by initiative. As evidence of the legislative intent underlying the planning act, however, the Elections Code provision is decidedly inapposite. The views of the Legislature in 1987 have little relevance to the intentions of an earlier Legislature in assigning responsibility for general plan amendments to the local "legislative body." (*Honey Springs Homeowners Assn.* v. *Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1137 [203 Cal.Rptr. 886]; see also *United States* v. *Price* (1960) 361 U.S. 304, 313 [4 L.Ed.2d 334, 340, 80 S.Ct. 326] ["the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"].)

Nor does Elections Code section 9111 persuasively establish a contemporary legislative "understanding" that a general plan may be amended by initiative. The statute does not purport to define the *scope* of the initiative power. It was enacted as part of an overall revision of the initiative *notice* provisions, and was aimed at providing the board of supervisors with *information* to better deal with proposed initiatives. As one committee staff analysis observed, the purpose of the provision was to accord the board of supervisors the "opportunity to make an informed decision on a proposed initiative . . . ." (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Analysis of Assem. Bill No. 2202 (1987-1988 Reg. Sess.) May 4, 1987.)

The majority's argument rests entirely on the supposition that Elections Code section 9111 cannot be "reconciled" with any conclusion other than a

legislative "understanding" that general plans may be amended by initiative. This is demonstrably incorrect. It is often unclear whether a proposed land use initiative aims to amend the zoning ordinance or the general plan. As *Lesher Communications Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531 [277 Cal.Rptr. 1, 802 P.2d 317] (*Lesher*) well illustrated, the purpose of a proposed land use initiative is not always self-evident; there, it was unclear whether the electorate intended an amendment of the city's general plan or a zoning ordinance. Thus, a report from the planning agency to the board of supervisors identifying the target of a proposed initiative as the general plan or indicating that it might result in some inconsistency, could influence the board's decision either to enact the proposed ordinance itself or perhaps even to initiate a legal challenge to the proposal as *outside* the scope of the initiative power.

It is illogical and unnecessary, therefore, to infer a legislative stamp of approval on the kinds of information that may be contained in the notice provisions of Election Code section 9111. Indeed, since it was part of an overall legislative revision of the initiative notice provisions, it appears much more likely that the statute was designed to enhance the response capabilities of the local legislative body rather than to define the scope of the initiative power. Given the uncertain intentions underlying the statute, it is dubious at best to conclude that it rebuts the clear inference of a legislative intent to vest exclusive authority in the local "legislative body."

B. *The Planning Law*

1. *The Text Specifically Contemplates Amendment by the Local Legislature*

Turning to the more pertinent provisions of the planning law itself, one finds at the outset that the relevant statutes strongly support the inference of a legislative intent to repose specific authority over general plan enactments and amendments with the local governing bodies of cities and counties. The adoption or amendment of a general plan begins with the local "planning agency," which may consist of a planning department, planning commission, or the legislative body itself. (§ 65100.) Each planning agency is charged with the initial responsibility to "prepare, periodically review, and revise, as necessary, the general plan," and then forward its recommendations to the local legislative body. (§ 65103, subd. (a).) "The legislative body shall [in turn] adopt or amend a general plan by resolution, which resolution shall be adopted by the affirmative vote of not less than a majority of the total membership of the legislative body. The legislative body may approve, modify, or disapprove the recommendation of the planning commission, if

any. However, any substantial modification proposed by the legislative body not previously considered by the commission during its hearings, shall first be referred to the planning commission for its recommendation." (§ 65356.) Section 65358, subdivision (a) adds that "the legislative body may amend all or part of an adopted general plan"; subdivision (b) of that section limits amendments to four per calendar year, but "Subject to that limitation, an amendment may be made at any time, as determined by the legislative body."

As guided by our seminal decision in *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491 [247 Cal.Rptr. 362, 754 P.2d 708] (*COST*), the first point to be gleaned from the statutory text is that the express, albeit generic, references to "legislative body" in sections 65356 and 65358 support at least an "inference that the [Legislature's] intent was to preclude action by initiative . . . ." (45 Cal.3d at p. 501.)[2]

This bare inference finds additional support in the statute. As discussed more fully in the part that follows, the planning law creates a unique, *process-intensive* structure for the enactment and amendment of general plans. It begins with the planning agency, a highly specialized body of individuals charged with the responsibility to review proposed amendments to the general plan and, when necessary, to propose revisions of its own. (§ 65103, subd. (a).) Thus, from the outset the statutory procedure for the amendment of general plans is irreconcilable with the initiative process, since the latter requires no planning agency review before submission to the voters.

Furthermore, section 65356 provides for enactment of a general plan by "resolution . . . adopted by the affirmative vote of not less than a majority of the total membership of the legislative body." Plainly only a *representative* legislative body can adopt a law by "resolution." Furthermore, the explicit statutory reference to a majority of the legislative body's "*membership*" clearly suggests an assemblage composed of individual "members." Thus, it is reasonably clear from the plain text that the Legislature specifically contemplated the city council or county board of supervisors when it provided for adoption and amendment of the general plan by the local "legislative body."

---

[2]Although the term "legislative body" is not expressly defined in the planning law, section 34000 in title 4, pertaining to "Government of Cities," states that it "means board of trustees, city council, or other governing body of a city."

## 2. The Procedural Requirements for Amendment of General Plans Are Irreconcilable With the Initiative Process

It is apparent that the Legislature not only specifically contemplated the local representative body to be the source of amending authority, but considered it to be the exclusive source of such authority. The text of the planning law offers substantial guidance here, as well. As explained below, the express statutory goals of the general plan—comprehensiveness and consistency—are integrally related to, and can only be fully accomplished by, the elaborate legislative process designed to achieve them. The legislative *ends*, in short, dictate the legislative *means*.

In determining legislative intent, it is well settled that courts may look to a variety of sources, including the overall statutory scheme of which the law is a part, the ostensible objects to be achieved, and, where available, the legislative history. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1009 [239 Cal.Rptr. 656, 741 P.2d 154].) Sections 65356 and 65358 are components of a larger, statutorily mandated legislative process, the ultimate object of which is the formulation of a "comprehensive, long-term, general plan for the physical development" of the community. (§ 65300.) In setting forth a broad statement of development policies and goals, every general plan must address a number of mandatory "elements," which currently consist of land use, circulation, conservation, housing, open space, noise and safety. (§ 65302.) It is not sufficient, moreover, to simply define land use, circulation, or housing policy. The planning law requires that each of the elements be carefully correlated with one another to "comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (§ 65300.5; see *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 [212 Cal.Rptr. 273].) Finally, to ensure the general plan's authority as the fundamental "constitution" for the physical development of every city and county, the planning law provides that all zoning regulations, subdivisions approvals and specific plans must be consistent with the general plan. (§§ 65860; 65359; see *Lesher, supra*, 52 Cal.3d at pp. 540-541; *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 570-572 [276 Cal.Rptr. 410, 801 P.2d 1161]; *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204, 1213 [217 Cal.Rptr. 790].)

As noted earlier, the process of adopting or amending a general plan begins with the local planning agency. The latter is charged with the initial responsibility to prepare a plan. (§ 65103, subd. (a).) To ensure comprehensiveness, the planning agency may "enter upon any land and make examinations and surveys" (§ 65105), and must "[d]uring the preparation or amendment of the general plan . . . provide opportunities for the involvement of citizens, public agencies, public utility companies, and civic, education, and other community groups . . . ." (§ 65351.) Furthermore, to

ensure internal consistency, the planning agency shall "periodically review, *and revise,* as necessary, the general plan." (§ 65103, subd. (a), italics added.) The legislative body exercises the final authority to adopt by resolution the general plan formulated by the planning agency; however, any substantial modification proposed by the legislative body not previously considered by the planning agency must be referred to the latter for its review and recommendation. (§§ 65300, 65356.)

As the statutory provisions summarized above make clear, comprehensiveness and consistency represent the fundamental guiding principles of the general plan, and the elaborate planning *process*—with its emphasis on widespread public involvement during general plan preparation and periodic review and revision by the planning agency to maintain the general plan's internal consistency—represent the essential means of achieving these goals. Thus understood, the conclusion logically and inescapably follows that the Legislature must have considered the local legislative body to be the exclusive means of general plan adoption and amendment. For the requirement of broad public input at the *preparation* stage, where competing interests may be balanced, demographic studies and surveys may be consulted, alternatives may be debated, and language may be modified and fine-tuned, can only be accomplished by the planning agency and the local legislative body acting through the traditional deliberative process.

The initiative offers many advantages as a legislative model, but it can not accommodate the planning law's clear mandate for broad community input at the *formulative* stage of general plan development. An initiative measure may be conceived and drafted with the involvement of numerous community interests, or one. It may seek to balance competing development policies, or elevate one approach to the exclusion of all others. An initiative measure is offered to the public on a take-it-or-leave-it basis and cannot be altered, amended or fine-tuned. An initiative can not achieve, in short, the fundamental legislative goal of a comprehensive blueprint for physical development formulated through widespread community involvement.

What is the majority's answer to the logical conundrum of reconciling the initiative process with the express statutory requirement of community involvement at the formulative stage? It declares the evidence to be "doubtful" and moves on, which is somewhat akin to declaring victory and abandoning the field.

*Consistency* represents the second major goal of the general plan, as explained in section 65300.5: "[T]he Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent *and* compatible statement of policies for the adopting agency." (See

*Concerned Citizens of Calaveras County* v. *Board of Supervisors, supra,* 166 Cal.App.3d at p. 97 ["If a general plan is to fulfill its function as a 'constitution' guiding 'an effective planning process,' a general plan must be reasonably consistent and integrated on its face."].) The planning agency implements this principle by serving as the legislative clearinghouse of general plan amendments, ensuring that proposals are consistent with other general plan elements as well as with the agency's long-term goals and policies. Nor is the agency purely reactive in this regard; it is *required* periodically to review and *revise* the general plan to ensure that its elements remain integrated and internally consistent. (§ 65103, subd. (a).)

If a general plan were subject to amendment by initiative rather than through the prescribed statutory process, the oversight function performed by the planning agency would be destroyed, and an ad hoc element introduced into a process that places the ultimate premium on comprehensiveness and consistency. Consistency, moreover, requires flexibility. As transportation conditions change, for example, noise, air quality, safety, and housing patterns are affected. If the general plan or some element thereof were subject to amendment *solely* by means of the initiative power because of the constraints of Elections Code sections 9125 and 9217, the planning agency's statutory responsibility to periodically revise or update the general plan to correlate its parts (§ 65103, subd. (a); *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 572) and the legislative body's authority to amend the general plan "at any time" that it deems necessary (subject to the limits of section 65358, subdivision (b)) would be effectively nullified. The initiative thus injects into the planning process an element of rigidity that defeats the statutory requirement of periodic review and revision to achieve the Legislature's goal of an integrated, internally consistent general plan.

What is the majority's response to the logical impossibility of reconciling the initiative process with the planning agency's express statutory mandate to periodically review and *revise,* as necessary, the general plan? It declares that nothing in the statute "suggests that a general plan that has not been prepared or reviewed by a planning department is invalid," but conspicuously omits any reference to the equally important requirement of *revising,* as necessary, the general plan to address changing conditions and to maintain internal consistency. Thus, the majority violates the cardinal principle that one must conform theory to facts, not arrange facts to fit theory.[3]

Finally, the majority opinion places substantial reliance on *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135

_____

[3]The majority observes in a footnote that the planning agency's statutory mandate to revise the general plan remains subject to final approval by the local legislative body. (Maj. opn., *ante,* at pp. 792-793, fn. 10.) This obvious statement underscores my point, since the planning

Cal.Rptr. 41, 557 P.2d 473] (*Associated Home Builders*). The issue there concerned the amenability of a *zoning* ordinance to the initiative power. One of the arguments raised by the plaintiff was that the initiative ordinance violated the state zoning law because it had been enacted without a noticed hearing. (*Id.* at pp. 591-592.) We rejected the contention—overturning in the process an earlier decision to the contrary (*Hurst* v. *City of Burlingame* (1929) 207 Cal. 134 [277 P. 308])—on the ground that "*the Legislature never intended the notice and hearing requirements of the zoning law to apply to the enactment of zoning initiatives.*" (18 Cal.3d at p. 594, italics added.)

The majority's inference from *Associated Home Builders, supra,* 18 Cal.3d 582, that statutory procedural requirements are simply *irrelevant* to the question whether an ordinance is subject to initiative is breathtakingly inaccurate. The issue in that case concerned the zoning law, and the holding was based upon a dearth of evidence suggesting a legislative intent to apply the procedural requirements to zoning ordinances. There is nothing in the opinion to suggest that, in a different legislative context, statutorily imposed procedural requirements would not be highly relevant.

The present facts and circumstances are, indeed, wholly distinguishable from *Associated Home Builders, supra,* 18 Cal.3d 582. The statute at issue here is not the state zoning law but the planning law, and as to that statute the evidence strongly indicates the Legislature intended the local legislative body to be the exclusive means of enacting and amending a general plan. There was no evidence in *Associated Home Builders* of a similar intent with respect to local zoning ordinances; indeed, the evidence with respect to zoning is to the contrary. As explained in the part that follows, the general plan was conceived initially as an extraordinary form of legislation requiring careful study, broad community input, unprecedented breadth, durability and internal consistency. Zoning, in contrast, has been consistently treated in conventional terms as ordinary legislation designed to implement the land use provisions of the general plan. Indeed, the authors of the original Standard Planning Act were so intent upon impressing the states with the importance of the general plan that they removed it from the traditional legislative sphere altogether, whereas the same authors placed the *zoning* power directly in the hands of the local legislative body.

Enactment of a zoning ordinance, moreover, is a generally routine procedure, not the process-intensive exercise of the general plan. To be sure,

law expressly provides that "an amendment [to the general plan] may be made *at any time, as determined by the legislative body.*" (§ 65358, subd. (a), italics added.) The majority's holding obliterates the plenary power statutorily reposed in the local "legislative body" to amend the general plan "at any time," since that power will reside exclusively with the *electorate* whenever any general plan provision has been previously adopted or amended by initiative. (Elec. Code, §§ 9125, 9217.)

zoning ordinances require a noticed public hearing before the local legislative body. (§ 65856.) But this is generally aimed at stimulating public interest in a largely *finished* product, drafted in circumstances wholly unconstrained by the web of procedures that contribute to the actual preparation of the general plan. The zoning law contains none of the requirements of the planning law relating to the *formulative* process itself, involving the matrix of statutorily mandated surveys and studies, community involvement, and the correlation with existing general plan elements and policies, that together comprise the heart of the planning process. The majority's assertion that the procedural requirements relating to zoning and planning are largely equivalent, is thus fundamentally incorrect.

Furthermore, unlike the general plan which is regional in scope and thus a matter of statewide concern, zoning has been consistently characterized as a matter of local concern and hence a purely "municipal affair." (*COST, supra,* 45 Cal.3d at p. 510.) For all of these reasons, therefore, the question of zoning's amenability to the initiative power is wholly distinguishable from the issue of a general plan's susceptibility to amendment by initiative. The holding in *Associated Home Builders* was correct on the question before it, but the issue here is entirely distinguishable and is not controlled by that case.

"The hallmarks of good land use planning are that decisions are well informed, [that] the planning process is flexible and responsive to changing circumstances and values, and that decisions reflect a comprehensive planning process and accommodate competing public interests." (Curtin & Jacobson, *Growth Control by the Ballot Box: California's Experience* (1991) 24 Loyola L.A. L.Rev. 1073, 1102.) These "hallmarks of good land use planning" represent, in fact, the fundamental principles and objectives of the general plan as expressly delineated by the Legislature in the planning law. The accomplishment of these objectives, as explained above, is dependent upon the legislative process mandated by the planning law, and thus excludes resort to the initiative power.

## C. *Legislative History*

Although neither the parties nor the majority has mined the extensive history of the planning law for whatever light it might shed on the problem before us, a review of that history reveals certain broad themes which strongly support the inference of a legislative intent to vest exclusive authority over the adoption and amendment of general plans in the local legislative body.

1. *The Standard Planning Act*

Planning and zoning laws in the United States were among a number of reforms associated with the multifaceted movement known as Progressivism that arose during the first decades of this century. Like other Progressive reforms such as the commission form of government, at-large voting districts, health and sanitation measures, and the "city beautiful" movement, the impetus behind planning and zoning reflected a broader "search for order" and faith in the power of scientific planning to solve social ills.[4]

Although a subject of considerable academic interest, planning and zoning laws had been enacted in only a few states before the mid-1920's. The pace of legislation increased dramatically, however, after an advisory committee to the United States Department of Commerce, under the leadership of then Secretary of Commerce Herbert Hoover, promulgated model legislation for zoning and planning titled, respectively, A Standard State Zoning Enabling Act (Advisory Com. on City Planning and Zoning, U.S. Dept. of Commerce (1926) and A Standard City Planning Enabling Act (Advisory Com. on City Planning and Zoning, U.S. Dept. of Commerce (1928) (Standard Planning Act or Act)). Both model acts exerted wide influence almost immediately; by the end of 1927, some 29 states had adopted zoning enabling legislation based largely on the standard zoning act (Haar, *In Accordance With A Comprehensive Plan* (1955) 68 Harv. L.Rev. 1154, 1155-1156); many states also adopted separate planning statutes, including California, which in 1927 adopted the state's original planning law, modeled to a large extent on a draft of the Standard Planning Act. (Stats. 1927, ch. 874, p. 1899; Standard Planning Act, p. iv; see also Kent, The Urban General Plan (1964) pp. 13, 32-64; Perry, *The Local "General Plan" in California* (1971) 9 San Diego L.Rev. 1, 2-3.)[5]

The authors of the Standard Planning Act expressed their ideas and the purposes underlying the Act's provisions in a series of explanatory footnotes appended to the original report to the Department of Commerce. These comments are remarkable in a number of respects, not least for their clarity

---

[4]On Progressivism as an effort by a new class of professionals to achieve order and efficiency through techniques of scientific and administrative control, see the seminal work by Wiebe, The Search for Order 1877-1920 (1967); see also Hawley, The Great War and a Search for a New Order 1919-1933 (1979); Chambers, The Tyranny of Change: America in the Progressive Era, 1900-1917 (1980); and Haber, Efficiency and Uplift: Scientific Management in the Progressive Era, 1890-1920 (1964).

[5]Although California's original zoning law was adopted several years before the promulgation of the Standard State Zoning Enabling Act (Stats. 1917, ch. 734, p. 1419), it contains remarkably similar provisions. (See Comment, *The Initiative and Referendum's Use in Zoning* (1976) 64 Cal.L.Rev. 74, 79.)

and straightforward treatment of the authors' intent. The authors of the Standard Planning Act believed that a "master plan"[6] governing the growth and development of the physical environment was essential to protect the health and welfare of citizens living in urban communities.[7] To this end, the Act provided for the creation of a "planning commission" whose function, inter alia, was to "prepare a general design of the city's development, so that development may take place in a systematic, coordinated and intelligently controlled manner." (Standard Planning Act, p. 13, fn. 31.)

The authors devoted considerable attention in their comments to the nature and functions of the planning commission, which in turn reflected their conception of the master plan itself. The latter was envisioned as a broad statement of development policies and goals for the city as a whole, "designed to cover a long period of future years." (Standard Planning Act, pp. 7-8, fn. 10.) This distinguished the master plan from other planning devices, such as zoning and subdivision maps, which were seen as simply tools to implement *short-term* land-use decisions in a manner consistent with the master plan's general scheme. (Kent, The Urban General Plan, *supra*, p. 35.) To ensure internal consistency within the plan itself, piecemeal drafting and frequent amendments were also discouraged: "The city plan is an organic whole, every part of which, whether considered territorially or as to subject matter, is organically interrelated with every other part." (Standard Planning Act, p. 17, fn. 42.) The planning process itself was viewed as a highly specialized discipline requiring consultation with experts in city planning, architecture, engineering, and the like. (*Id.* at p. 12.)

The powers and functions of the planning commission reflected the master plan concept. Under the Standard Planning Act, the commission was vested with plenary authority over the promulgation and adoption of the master plan. "It shall be the function and duty of the commission to make and adopt a master plan for the physical development of the municipality, including any areas outside of its boundaries which, in the commission's judgment,

---

[6]Although the term "general plan" eventually displaced "master plan" in the statutory scheme, they refer to the same document and are used interchangeably herein.

[7]The authors of the Standard Planning Act explained why a general plan is necessary in terms that apply as well today as when they were written over 60 years ago: "The plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, morals, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development; including, among other things, adequate provision for traffic, the promotion of safety from fire and other dangers, adequate provision of light and air, the promotion of healthful and convenient distribution of population, the promotion of good civic design and arrangement, wise and efficient expenditure of public funds, and the adequate provision of public utilities and other public requirements." (Standard Planning Act, p. 17, fn. 41.)

bear relation to the planning of such municipality." (Standard Planning Act, § 6, pp. 13-14.) Consistent with the concept of the master plan as a general statement of development policies and goals, the authors cautioned that the "planning commission should view all . . . phases of a city's development in a broad and comprehensive fashion and should not concern itself with detailed administrative duties which rightfully belong to other branches of government." (*Id.* at p. 13, fn. 31.) Indeed, although a majority of the commission membership was appointed by the mayor or city council, the latter were largely *excluded* from the planning process. As perceived by the authors, "the *planning* function is quite different and distinct from the *legislative* function." (Standard Planning Act, p. 7, fn. 10, italics added.) The comments explained: "Planning is intended to be a process whereby the larger lines and directions of future public and private development will be influenced and to some extent controlled. It should be designed to cover a long period of years, much longer than the term of office of any single city council, including the city council which is in office at the time of adoption of the plan or any part of it. Legislation is designed to meet pressing and immediate needs, whether it take the form of penal legislation controlling persons or property or whether it be fiscal legislation expending public funds. The two functions, planning and legislation, are important and essential to the efficient working of city government, but they are quite different from each other and involve differing considerations, differing points of view, and differing talents and interests. The two functions, therefore, need to be reposed in two separate bodies . . . ." (Standard Planning Act, pp. 18-19, fn. 44.)

Thus, the authors' conception of the master plan as a comprehensive statement of long-term development policies, requiring the application and integration of multiple disciplines in fields as diverse and exacting as economics, engineering, geology, architecture and city planning, by definition disqualified the city council from direct participation; the local legislative body, in the authors' view, was more properly concerned with short-term political and fiscal problems than long-term, technical planning issues. (See Kent, The Urban General Plan, *supra*, pp. 53-59.) Of course, this did not preclude the city council from participating in *all* land-use decisions. On the contrary, as earlier noted, the same advisory committee that created the Standard Planning Act promulgated a standard zoning law which expressly vested authority over zoning decisions in the local "legislative body." (A Standard State Zoning Enabling Act, reprinted in Rathkopf, The Law of Zoning and Planning (1949) pp. 547-551.) The authors' differing treatment of zoning and planning undoubtedly reflected their perception of zoning as basically one of several conventional means of implementing the master plan, and therefore properly subject to short-term political pressures and

interests. (Haar, *In Accordance With A Comprehensive Plan, supra*, 68 Harv. L.Rev. at p. 1156.)

### 2. *The Planning Act in California*

As noted above, California adopted its first planning law in 1927 modeled, to a large extent, upon the Standard Planning Act. (Stats. 1927, ch. 874, pp. 1899-1913.) Consistent with the Act, the California law authorized cities and counties to create a planning commission composed of members appointed by the chief executive officer and the local legislative body. In terms nearly identical to the Act, the California law vested primary authority in the planning commission to "make and adopt a master plan for the physical development of the municipality, or county, and of any land outside its boundaries which, in the commission's judgment, bears relation to the planning thereof." (Stats. 1927, ch. 874, § 4, p. 1901.) Also in accordance with the Act, the California planning law charged the commission with the essential task of making "careful and comprehensive surveys and studies of present conditions and future growth of the municipality, or county, with due regard to its relation to neighboring territory," for the ultimate "purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the municipality, or county, and its environs . . . ." (Stats. 1927, ch. 874, § 5, pp. 1901-1902.) Also consistent with the Act, the California statute required the commission to hold at least one public hearing before adopting the master plan or any substantial revision thereof.

In a departure from the Standard Planning Act, the California law provided for referral of the master plan adopted by the planning commission to the local "legislative body." (Stats. 1927, ch. 874, § 7, p. 1902.) The latter, following notice and a hearing, was empowered to adopt the plan wholesale. However, any changes or additions by the legislative body had to be referred to the planning commission for study and approval. In the event of the commission's disapproval, the legislative body was authorized to override the commission, but only by a "two-thirds vote of the entire membership of the legislative body . . . ." (*Ibid.*) Thus, although the planning commission retained primary authority over the drafting and implementation of the master plan, California's enabling act provided for some participation by the local legislative body.

The planning law was amended in 1929. New provisions were added requiring that the general plan contain specific elements addressing traffic, transportation, transit and parks systems. (Stats. 1929, ch. 838, § 4, p. 1808.) The powers of the planning commission were further enhanced by authorizing the commission to contract with architects, city planners, engineers,

and other consultants for such services as they required. In addition, the two-thirds legislative override was modified to allow the legislative body to overrule the commission by a simple "majority vote of the entire membership of the legislative body . . . ." (*Id.*, § 6, p. 1809.)

A comprehensive revision of the planning law in 1947 authorized additional elements covering conservation of natural resources, as well as land use, recreation, streets and highways, public services and buildings, community design and housing. (Stats. 1947, ch. 807, §§ 38-46, pp. 1914-1915.) The law continued to place primary responsibility for the drafting and implementation of the master plan on the planning commission, and continued to require the commission to "promote the public interest in and understanding of the master plan and of official plans and regulations relating thereto." (*Id.*, § 50, p. 1915.) The law further charged the commission with the affirmative duty to "consult and advise with public officials and agencies, public utility companies, civic, educational, professional and other organizations, and with citizens generally with relation to the carrying out of such plans." (*Ibid.*) The commission, and its members, were also authorized "in the performance of their functions, [to] enter upon any land and make examinations and surveys," and were broadly vested with "such power as may be necessary to enable [them] to fulfill [their] functions and carry out the purposes of this act." (*Ibid.*) However, while the law continued to require that any revisions suggested by the legislative body be referred to the commission for review and comment, it no longer required a legislative override of those changes disapproved by the commission, leaving the final decision in the hands of the legislative body.

Legislative amendments to the planning law in 1951 (Stats. 1951, ch. 334, p. 675), 1953 (Stats. 1953, ch. 1355, p. 2913), 1955 (Stats. 1955, ch. 1644, p. 2967), 1965 (Stats. 1965, ch. 1880, p. 4334) and 1971 (Stats. 1971, ch. 1446, p. 2852) gradually expanded the substantive content and enhanced the relative status of the master plan as the fundamental constitution of local development, but left largely intact the respective roles of the planning commission and the local legislative body in the adoption and amendment process.[8] The current planning law mandates that every city and county shall have a "planning agency" which may consist of a combination of entities including a planning department, planning commission or the legislative

---

[8]Although originally discretionary, general plans were eventually made mandatory for all cities and counties. (See Curtin, California Land Use and Planning Law (14th ed. 1994) p. 7.) Perhaps the most significant amendment, however, occurred in 1971, when the Legislature explicitly provided that zoning regulations and subdivision approvals must be consistent with the general plan. (§ 65860, added by Stats. 1971, ch. 1446, p. 2858.) This express requirement solidified the general plan as the fundamental "constitution" for all land use development in the city or county. (*Lesher, supra*, 52 Cal.3d at pp. 540-541; *Citizens of Goleta Valley* v. *Board*

body itself. (§ 65100.) As under the original law, the planning agency is required to "Prepare, periodically review, and revise, as necessary, the general plan" (§ 65103, subd. (a)), and the local legislative body is required to "adopt or amend a general plan by resolution." (§ 65356; see also §§ 65300, 65358.) Extensive consultation with outside agencies, expert consultants, and interest groups also continues to be a necessary part of the process. "During the preparation or amendment of the general plan, the planning agency shall provide opportunities for the involvement of citizens, public agencies, public utility companies, and civic, education, and other community groups, through public hearings and any other means the city or county deems appropriate." (§ 65351.)

### 3. *Legislative Intentions*

Although the history of the planning law summarized above yields no direct evidence bearing on the role, if any, of the initiative power, it reveals some very relevant themes. Foremost among these is the principle that the legislative *process* established by the planning law is integral to the achievement of its goals, and that reliance on the initiative power would effectively thwart these goals.

Clearly the authors of the Standard Planning Act did not consider the initiative to be a viable means of enacting or amending the master plan. Indeed, by defining the planning process itself to be a unique and highly specialized function, largely outside the scope and competence of the local legislative body, the Act virtually insulated the master plan from the power of the initiative and referendum. For it was, and is, generally understood that the initiative and referendum extend only to matters that are *legislative* in nature. (*Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 611 [150 P. 977]; *Dwyer* v. *City Council* (1927) 200 Cal. 505, 511 [253 P. 932]; *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 569-570 [205 Cal.Rptr. 801, 685 P.2d 1152].) Thus, the authors' characterization of the planning function as distinct from the legislative process effectively removed the master plan from the direct influence of the electorate acting through the initiative power.

California, as noted, never erected the solid wall between the planning commission and the legislative body contemplated by the Standard Planning Act. Although the planning commission retained primary responsibility for the drafting and implementation of the master plan, the local "legislative body" was empowered to review and ultimately approve or disapprove it.

*of Supervisors, supra,* 52 Cal.3d at p. 570; *deBottari* v. *City Council, supra,* 171 Cal.App.3d at p. 1213.)

(Stats. 1927, ch. 874, § 7, p. 1902.) Hence, California recognized from the outset that the master plan was essentially "legislative" in nature. (See *Yost v. Thomas, supra,* 36 Cal.3d 561.) However, it is clear that the "legislative body" referred to in the original planning law was the local city council or board of supervisors, and their responsibility—as originally conceived—was limited. This is readily apparent from the provision that any legislative changes or additions to the master plan must be approved by the commission, and the requirement of a "two-thirds vote of the entire *membership* of the legislative body" to enact any change disapproved by the commission. (Stats. 1927, ch. 874, § 7, p. 1902.) The requirement of a two-thirds vote of the "membership" of the legislative body plainly implies action by a finite group or collectivity of individuals, i.e., a representative body. Although the legislative override was later reduced to a "majority vote of the entire membership of the legislative body" (Stats. 1929, ch. 838, § 6, p. 1809) and ultimately eliminated altogether, there is no evidence that the original understanding of "legislative body" as signifying the local representative body was ever modified. Indeed, as discussed earlier, the current law continues to require approval by "*resolution . . .* adopted by the affirmative vote of not less than a majority of the total *membership* of the legislative body." (§ 65356.)

Equally evident from the foregoing history is the fact that from its inception the California planning law embraced the model act's vision of the master plan as a complex *end product* requiring a special commission to undertake "careful and comprehensive surveys and studies of present conditions and future growth," to consult with experts and other interested civic groups and public agencies, to conduct public hearings, and to balance all of these interests in the pursuit of "accomplishing a coordinated, adjusted and harmonious development . . . ." (Stats. 1927, ch. 874, § 5, p. 1901; see also *id.,* §§ 3, 4, p. 1901.)

What the California law mandated, in short, was a particularized *process* the final outcome of which would serve as the community master plan. The latter constituted a new and unique form of municipal legislation; it was not merely a mundane ordinance dealing with transitory political or fiscal issues, but a comprehensive statement of long-term development policy, the complex culmination of a statutorily mandated process involving demographic surveys, economic studies, expert analyses and consultations, referrals to outside agencies, and public hearings. True to the spirit of the original Standard Planning Act, in sum, the California Legislature enacted a genuine "plann*ing*" statute; it mandates not merely a local "plan" but a *plan of action,* a particularized process or methodology designed ultimately to yield a long-term, comprehensive and harmonious blueprint for future growth.

The implications of these historical and abiding legislative *ends* with respect to the *means* of achieving them are clear. From its inception, the general plan was conceived to be an "organic whole." That essential concept endures through the statutory requirement that each of its elements be carefully correlated and harmonized by the planning agency so that it "comprise[s] an integrated, internally consistent and compatible statement of policies for the adopting agency." (§ 65300.5.) Amendments to the plan were originally discouraged and are currently limited to four per calendar year (§ 65358, subd. (b)) precisely in order to preserve internal consistency, comprehensiveness, and the long-term character of the plan. (See *Lesher, supra,* 52 Cal.3d at p. 541; *deBottari* v. *City Council, supra,* 171 Cal.App.3d at p. 1212.) Planning by initiative would defeat these historic and enduring legislative goals by circumventing the statutorily mandated requirements of broad community involvement in the preparation of the general plan, and periodic review and revision by the planning agency to ensure internal consistency.

Thus, the history of the planning law strongly supports the conclusion that amendment of the general plan by the local legislative body represents a necessary and critical component in the achievement of the Legislature's essential goals.

### D. *Statewide Concern*

As the majority correctly notes, an "important factor" (*COST, supra,* 45 Cal.3d at p. 505) in determining whether the Legislature intended to vest exclusive authority in the local "legislative body" is whether the statute deals with a matter of statewide concern rather than a purely municipal affair. "[A]n intent to *exclude* ballot measures is more readily inferred if the statute addresses a matter of *statewide* concern rather than a purely municipal affair." (*Id.* at p. 501, italics added.) Unfortunately, the majority ignores the evidence most relevant to this issue, and distorts the critical fact that charter cities must—by statute—adopt general plans with all of the mandatory elements included—a sure indicator of the Legislature's belief that the general plan constitutes a matter of fundamental statewide importance.

Although the distinction can be elusive, this court has made it clear that the term " 'statewide' refers to all matters of more than local concern" (*COST, supra,* 45 Cal.3d at p. 505), and encompasses subjects which contain a "dimension demonstrably transcending identifiable municipal interests . . . ." (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 17 [283 Cal.Rptr. 569, 812 P.2d 916].) A finding of statewide concern does not "necessarily rest on the conclusion that the subject matter

. . . is not appropriate for municipal regulation" (*id.* at p. 18), but rather that it exhibits genuine "extramunicipal concerns." (*Ibid.*) Although the ultimate determination rests with the courts, the legislative goals and the factors which influenced the Legislature to enact the law in question are entitled to substantial weight. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62-63 [81 Cal.Rptr. 465, 460 P.2d 137].)

That land-use planning in general, and the formulation and implementation of the general plan in particular, constitute matters of manifest statewide importance, becomes evident from an examination of the text and the purposes of the planning law as a whole. Although the law ensures that most land-use decisions remain within local control, it also recognizes that those decisions may have profound ramifications for neighboring entities, the region and the state, and therefore requires that each planning agency be guided by and implement certain fundamental state policies and goals. In a prefatory statement of policy and intent, the Legislature has broadly identified those critical state concerns as follows: "The Legislature finds and declares that California's land is an exhaustible resource, not just a commodity, and is essential to the economy, environment and general well-being of the people of California. It is the policy of the state and the intent of the Legislature to protect California's land resource, to insure its preservation and use in ways which are economically and socially desirable in an attempt to improve the quality of life in California." (§ 65030.)

The Legislature has further declared that land-use planning, *and the general plan in particular*, represent the basic means of ensuring orderly growth throughout the state. Thus, the Legislature has decreed that all "decisions involving the future growth of the state," while generally subject to local control, must be "guided by an effective planning process, including the local general plan, and should proceed within the framework of *officially approved statewide goals and policies* directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." (§ 65030.1, italics added.) The Legislature has further evidenced its conviction that the general plan and its implementation constitute matters of fundamental statewide interest by requiring that charter cities adopt general plans containing all of the mandatory elements set forth in the act. (§ 65700.)

This court has also recognized the important statewide interest in ensuring effective land-use planning and controlled growth at the local level. As we have observed: "The deleterious consequences of haphazard community growth *in this state* and the need to prevent further random development are

evident to even the most casual observer. The Legislature has attempted to alleviate the problem by authorizing the adoption of long-range plans for orderly progress." (*Selby Realty Co.* v. *City of Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111].)

The "extramunicipal" dimension of the general plan is further evidenced by the nature of its mandatory elements and the process of its formulation. Comprehensive planning necessarily requires consideration and balancing of numerous interrelated social, geographic and economic issues, denominated under the planning law as mandatory "elements"; these currently consist of land use, circulation, housing, conservation, open space, noise and safety. (§ 65302.) The planning law requires that local planning agencies "Promote the coordination of local plans and programs with the plans and programs of other public agencies." (§ 65103, subd. (f).) To this end, it requires that proposed general plans or amendments thereto must, prior to adoption, be referred for review and comments to abutting cities and counties, the local agency formation commission, and any affected special districts, areawide planning agency, school districts and water suppliers. (§ 65352.)

The planning law also explicitly requires, with respect to certain of the mandatory elements, that the planning agency take into account regional concerns and consult with pertinent regional or state agencies. Safety elements or amendments thereto must be submitted to the Division of Mines and Geology of the State Department of Conservation. (§ 65585, subd. (b).) The housing element must expressly identify and analyze the locality's housing stock and set forth goals, policies and quantified objectives in relation to the locality's share of the *regional* housing needs (§§ 65583, subd. (a)(1), 65584); the local planning agency must submit a draft housing element or draft amendment to the State Department of Housing and Community Development for review and comments. (§ 65585, subd. (b).)

The housing element may be the most obvious, but is far from the only mandatory element with significant regional ramifications. As the General Plan Guidelines formulated by the Office of Planning and Research observe, it is increasingly important for planning agencies "to view the local general plan in its regional context. Traditionally, the concept of 'community' encompassed only a local entity—the city or county. With increasing urbanization and the growing interdependence of local governments, particularly in metropolitan areas, the concept has developed a regional perspective. Each local planning agency carries a responsibility to coordinate its general plan with regional planning efforts as much as possible. . . . [¶] *Issues of regional importance may include transportation, housing, schools, commerce, employment, growth management, public utility service, communications, infrastructure, solid and hazardous waste management, water and air quality,*

*open space, and coordination of emergency services.*" (Off. of Planning and Research, General Plan Guidelines (1987) ch.1, pp. 7-8, italics added (General Plan Guidelines).)

The regional perspective mandated by the planning law has been recognized by the courts as well. As we observed in *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541 [99 Cal.Rptr. 745, 492 P.2d 1137] (upholding the right of nonresident landowners to notice of a proposed development within the city's borders): "In today's sprawling metropolitan complexes . . . municipal boundary lines rarely indicate where urban development ceases. We have come to recognize that local zoning may have even a regional impact. [Citation.]" (*Id.* at p. 548.) This change from a local to a regional and statewide perspective in land use planning found clear expression in *Associated Home Builders, supra,* 18 Cal.3d 582, where we observed: "In past cases . . . we have been content to assume that the [land-use] ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. But municipalities are not isolated islands remote from the needs and problems of the area in which they are located . . . ." (*Id.* at p. 607.) Hence we held that the constitutional test of the reasonableness of a land use ordinance must be judged by its impact on the region which it affects. (*Ibid.*)

Notwithstanding the evidence summarized above, the majority concludes that the general plan cannot be deemed to be a matter of statewide concern. The flaws in the majority's reasoning are self-evident. First, it confuses local control with local interest, erroneously concluding that because land-use decisions remain primarily within the control of local entities the general plan must be a matter of purely municipal concern. The retention of local control is not dispositive, however. Indeed, this court rejected a similar argument in *COST, supra,* 45 Cal.3d 491, where it was urged that because the statutory scheme at issue left the decision to impose a transportation development fee within the discretion of the affected cities, the matter could not be considered one of statewide concern. "[I]n seeking to achieve objectives of statewide concern," we explained, "the Legislature is not limited to means which are mandatory or coercive but can also employ means reasonably calculated to facilitate or encourage appropriate action by local entities . . . ." (*Id.* at p. 507.)

The Legislature has made it clear that each local entity must implement the provisions of the planning act "in ways that accommodate local conditions and circumstances, *while meeting its minimum [statutory] requirements.*" (§ 65300.7, italics added.) Local decisions, including the general plan, must "proceed within the framework of *officially approved statewide*

*goals and policies . . . .*" (§ 65030.1.) Thus, although local cities and counties retain ultimate control over specific land use decisions, the Legislature has left no doubt that those decisions affect fundamental statewide interests and must be made in accordance with state policies.

An additional fallacy underlying the majority's conclusion lies in its failure to appreciate the fundamental general plan principles of comprehensiveness and consistency. For example, the circulation element is not simply an internal transportation plan; it has "direct relationships with the housing, open space, noise and safety elements" (General Plan Guidelines, *supra*, ch. 3, p. 91), and must be specifically correlated with the land use element, as well. (§ 65302, subd. (b).) Transportation routes affect human and physical settlement patterns throughout the region, which in turn have a major impact on air quality, plant and animal habitats, and noise, as well as a significant influence on the regional economy in terms of delivery of materials, products, and workers. (*Ibid.*; see *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 700-702 [188 Cal.Rptr. 233]; *Concerned Citizens of Calaveras County* v. *Board of Supervisors, supra,* 166 Cal.App.3d at p. 97.)

Similar interrelationships and regional interests are inherent in every element of the general plan. Indeed, the initiative measure in this case provides a classic illustration of the profound regional ramifications of amending simply one element—the land-use element—of the general plan. The provisions of Measure J, classifying substantial portions of county land as agricultural, open space or watershed, obviously affect population density and building intensity, which in turn influence transportation and other infrastructure needs, as well as environmental, safety, and aesthetic interests. The statement of "findings and purpose" in Measure J explicitly recognized the interrelated regional interests at stake, observing: "Uncontrolled urban encroachment into agricultural and watershed areas will impair agriculture and threaten the public . . . by causing increased traffic congestion, associated air pollution, and potentially serious water problems. . . . Such urban encroachment, or 'leap-frog development,' would eventually result in both the unnecessary, expensive extension of public services and facilities and inevitable conflicts between urban and agricultural areas." The impact on the county's current and future housing stock, its ability to meet its regional share of housing for all economic segments, was equally plain. As the ballot argument in favor of Measure J pointedly observed: "Napa County is under tremendous pressure to grow from the same forces that produced mushrooming urban sprawl in Contra Costa and Solano Counties. Napa County is a desirable place to live within commuting distance to Bay area jobs, putting it in danger of going the way of other Bay area counties." Thus, the provisions

of Measure J were clearly intended to limit and redirect the county's future development of housing stock, with a view to influencing metropolitan growth patterns throughout the region.

The majority's reliance on case law is equally flawed. It is noted that several dated Court of Appeal decisions held that the general plan concerns matters of purely local rather than statewide interest. (See *Duran* v. *Cassidy* (1972) 28 Cal.App.3d 574, 583 [104 Cal.Rptr. 793]; *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774, 783 [42 Cal.Rptr. 283]; *Fletcher* v. *Porter* (1962) 203 Cal.App.2d 313, 318-319 [21 Cal.Rptr. 452].) As this court has observed, however, the definition of a municipal affair " 'is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate' . . . ." (*California Fed. Saving & Loan Assn.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 18, quoting *Pac. Tel & Tel. Co.* v. *City and County of S.F.* (1959) 51 Cal.2d 766, 771 [336 P.2d 514].) Dramatic increases in population and physical development over the last two decades have resulted in a major reemphasis on regional and statewide interests in planning. (See Mandelker, *The Role of the Local Comprehensive Plan in Land Use Regulation* (1976) 74 Mich. L.Rev. 899, 900.) This heightened awareness of the hazards of uncoordinated local planning elicited an unequivocal legislative response. In 1976 the Legislature decreed that all decisions involving the future growth of the state, although subject to local control, must "proceed within the framework of officially approved *statewide* goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." (§ 65030.1, italics added.) The General Plan Guidelines, originally promulgated in 1980, underscore the importance of a regional approach to the development and implementation of all facets of the general plan. (General Plan Guidelines, *supra,* pp. 7-8.) And the legislative determination in 1971 to extend the mandatory provisions of the general plan to charter cities lends further proof to the strong state interests in the formulation and implementation of the general plan. The judiciary has also kept pace in this regard, consistently holding that planning must reflect local, regional and statewide interests. (See *Scott* v. *City of Indian Wells, supra,* 6 Cal.3d at p. 548; *Selby Realty Co.* v. *City of Buenaventura, supra,* 10 Cal.3d at p. 120; *Associated Home Builders, supra,* 18 Cal.3d at p. 607; *City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 553 [187 Cal.Rptr. 893];

*Buena Vista Gardens Apartment Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 306-307 [220 Cal.Rptr. 732].)[9]

Finally, the majority's assertion that the Legislature's decision to apply the general plan requirement to charter cities somehow *undermines* the finding of statewide interests can only be described as astonishing, and cannot be taken at face value. As noted, the fact that the Legislature has required the adoption of general plans by charter cities means, by definition, that the Legislature considers the general plan to be a subject of statewide importance. (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 51, 61; *COST, supra,* 48 Cal.3d at p. 505.) The majority attempts to invert this conclusion by noting that the statute (§ 65700, subd. (a)) requiring the adoption of general plans by charter cities makes no reference to the elaborate statutory scheme for the amendment of general plans, and thus the majority infers a legislative "declar[ation]" that the process of plan amendment was *not* a matter of statewide concern."

Although certainly deserving of full marks for inventiveness, the argument is nonetheless entirely specious. This court has decided on numerous prior occasions that a matter was of sufficient statewide importance that the legislative decision to vest power in the local representative body implied an exclusion of the local electorate. (See, e.g., *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947]; *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225]; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832 [313 P.2d 545]; *COST, supra,* 45 Cal.3d 491.) In none of these cases was the court concerned with the hypertechnical question whether the statute referred to "adoption" or "amendment." The issue, rather, was whether the statute dealt with a *subject matter* of broad statewide significance. In *COST,* for example, we concluded that the "construction of major highways has effects beyond municipal boundaries" and thus held that a statute authorizing the local financing of transportation corridors vested exclusive decisionmaking authority in the local representative bodies. (45 Cal.3d at p. 506.) The question, here, by analogy, is whether the general plan has "effects beyond municipal boundaries," and the answer, as outlined above, is plainly yes.

In a long and reputable series of cases, culminating most recently with *Voters for Responsible Retirement* v. *Board of Supervisors* (1995) 8 Cal.4th

---

[9]The only recent judicial statement even arguably to the contrary is contained in *COST, supra,* 45 Cal.3d at page 504, where we listed *Yost* v. *Thomas, supra,* 36 Cal.3d 561 (which upheld a referendum on a general plan amendment) among a series of cases that we characterized as dealing with "purely local concern." Nothing in *Yost* v. *Thomas, supra,* 36 Cal.3d 561 however, supports this statement, which was dictum in the context of *COST,* was neither explored nor developed, and in retrospect was plainly ill-considered.

765 [35 Cal.Rptr.2d 814, 884 P.2d 645] (*Voters*), this court has consistently recognized the Legislature's power to preempt the local initiative and referendum "as part of the exercise of its plenary power to legislate in matters of statewide concern." (*Id.* at p. 779.) In *Voters*, this court found a legislative intent to preempt a local referendum on a county ordinance adopting a memorandum of understanding (MOU) relating to the participation of local employees in the Public Employees' Retirement System (PERS). We inferred such a preemptive intent from a statute providing that ordinances of the kind in question shall go into effect immediately, reasoning that a referendum would conflict with this legislative mandate. (*Id.* at p. 776.) Moreover, while acknowledging that nothing on its face suggested a statutory scheme "from which a statewide purpose can be inferred" (*id.* at p. 779), we nevertheless discerned such a purpose from certain mandatory procedures in the Meyers- Milias-Brown Act relating to collective bargaining. As we observed, "If the bargaining process and ultimate ratification of the fruits of this dispute resolution procedure by the governing agency is to have its purpose fulfilled, then the decision of the governing body to approve the MOU must be binding and not subject to the uncertainty of referendum." (*Id.* at p. 782.)

Our analysis and conclusion in *Voters*, *supra*, 8 Cal.4th 765, are irreconcilable with the majority's holding herein. The conflicts that appear on their face between the initiative power and the planning law's provisions for community involvement in the preparation and amendment of the general plan, and the local legislative body's mandate to review and revise, as necessary, the general plan, are, if anything, far more compelling and persuasive than the apparent conflict between the referendum power and the urgency provision in *Voters*. Nor does the asserted statewide interest in collective bargaining over local wages and hours even approach in importance the fundamental, indeed transcendent statewide interests in land use, housing, and transportation patterns throughout a multicounty region of the state. Finally, there is no sound basis to conclude that a governing agency's procedures and decision relating to a local collective bargaining agreement "must be binding and not subject to the uncertainty of referendum" (*id.* at p. 782), and yet hold that an even more elaborate set of procedures for the adoption and amendment of a general plan are merely optional, and that the local agency's decisions may be completely undermined by the voters acting through the initiative power. No principled distinction differentiates *Voters* from the case at bar other than the fact that one deals with the arcana of the public retirement system, while the other deals with land use and development, a subject of broad public interest. This is not, in my view, a legitimate distinction.

CONCLUSION

I fully agree with the proposition that courts must, whenever reasonably possible, construe an initiative measure to ensure its validity. (*Lesher, supra,* 52 Cal.3d at p. 543.) "Basic to all statutory construction, however, is ascertaining and implementing the [legislative] intent . . . ." (*Ibid.*) In the state planning law the Legislature has expressly articulated the state's vital interest in comprehensive planning, and has meticulously prescribed the process whereby the local "legislative body" of each city and county shall adopt and amend its general plan. A review of the legislative text, history and objectives leads me to conclude that the Legislature intended the authority thus delegated to be exercised by the local legislative bodies specifically and exclusively, to the exclusion of the electorate acting through the initiative power.

Accordingly, I would reverse the judgment of the Court of Appeal.

Baxter, J., concurred.